In the Matter of HELEN CHERKIS, Respondent, against VINCENT R. IMPELLITTERI, as Mayor of the City of New York, Appellant.

Argued March 11, 1954; decided May 27, 1954.

*Adrian P. Burke, Corporation Counsel* (*Michael A. Castaldi, Seymour B. Quel, W. Bernard Richland, Bernard Friedlander* and *Barbara Carroll* of counsel), for appellant. I. Reports of the commissioner of investigation to the Mayor are papers prepared for use in an investigation within the meaning of sections 893 and 894 of the charter, and are therefore protected from taxpayer inspection, regardless of whether the investigation is continuing or has terminated. (*Matter of Hirshfield* v. *Craig,* 239 N. Y. 98; *Matter of Hertle* [*Ahearn*], 120 App. Div. 717, 190 N. Y. 531; *Matter of Murtagh* v. *Leibowitz,* 303 N. Y. 311; *People ex rel. Westray* v. *Mayor of City of N. Y.,* 16 Hun 309, 82 N. Y. 491; *Matter of Costello* [*Kreutzer*], 202 Misc. 51; *Matter of Rubel Corp.* [*McGann*], 295 N. Y. 638; *Matter of Walthaw Corp.* [*President of Borough of Manhattan*], 295 N. Y. 700.) II. The legislative history of the charter provisions governing the department of investigation and regulating inspection of papers of city agencies by taxpayers, as well as the institutional history of the department of investigation, demonstrate that such department was created to function primarily as a confidential staff agency supplying information to the Mayor, with statutory protection against taxpayer inspection of its reports and other papers. III. An interpretation of the charter sanctioning compulsory publication of reports of the commissioner of investigation would contravene the public policy protecting the papers of official investigating agencies from prejudicial disclosure. (*People ex rel. Woodill* v. *Fosdick,* 141 App. Div. 450; *Lewis* v. *Roux Trucking Corp.,* 222 App. Div. 204; *Heaphy* v. *Mandio,* 278 App. Div. 579; *Matter of Porteous,* 50 N. Y. St. Dept. Rep. 28; *State* v. *Freedy,* 198 Wis. 388.) IV. The harmful consequences and infringements of civil liberties, which would result from the interpretation of the charter adopted below, are compelling evidence that such interpretation should be rejected. (*People* v. *Ryan,* 274 N. Y. 149; *Matter of Rouss,* 221 N. Y. 81; *Briarcliff Lodge Hotel* v. *Citizen-Sentinel Publishers,* 260 N. Y. 106; *Mack, Miller Candle Co.* v. *MacMillan Co.,* 239 App. Div. 738; *Farrell* v. *New York Evening Post,* 167 Misc. 412; *Matter of Dairymen's Co-op. Assn.* v. *Murtagh,* 274 App. Div. 591, 299 N. Y. 634.) V. Section 51 of the General Municipal Law and section 66 of the Public

Officers Law do not apply to reports submitted to the Mayor by the commissioner of investigation. (*Matter of Egan* v. *Board of Water Supply*, 205 N. Y. 147; *Hale* v. *City of New York*, 251 App. Div. 826; *Matter of Natelson* v. *Portfolio*, 291 N. Y. 290; *Matter of Blandford* v. *McClellan*, 173 Misc. 15; *People ex rel. Scweller* v. *Prendergast*, 89 Misc. 584; *People ex rel. Stenstrom* v. *Harnett*, 131 Misc. 75, 224 App. Div. 127, 249 N. Y. 606.)

*Howard M. Squadron* and *Lois Waldman* for respondent. I. The petition herein, seeking an inspection of the report of the commissioner of investigation concerning his inquiry into charges of waste and corruption in the department of correction, states a cause of action under the taxpayer inspection provisions of the New York City Charter and State statute. (*Matter of Ihrig* v. *Williams*, 181 App. Div. 865; *Matter of Egan* v. *Board of Water Supply*, 148 App. Div. 177, 205 N. Y. 147; *Matter of North* v. *Foley*, 238 App. Div. 731; *Matter of Becker* v. *Lunn*, 200 App. Div. 178; *Matter of Sosa* v. *Lincoln Hosp. of City of N. Y.*, 190 Misc. 448; *Matter of Birenbaum* v. *Carey*, 175 Misc. 351; *Matter of Sears Roebuck & Co.* v. *Hoyt*, 202 Misc. 43; *Matter of Allen*, 205 N. Y. 158; *Matter of Coopersberg* v. *Taylor*, 148 Misc. 824; *Matter of Zuppa* v. *Maltbie*, 190 Misc. 778.) II. The exception to the inspection provisions of sections 893 and 894 of the City Charter, which is the sole legal ground relied upon by appellant herein for his resistance to inspection, has no application to the report sought to be inspected by petitioner. (*Hickman* v. *Taylor*, 329 U. S. 495; *People ex rel. Lemon* v. *Supreme Court*, 245 N. Y. 24; *Matter of Herlands* v. *Surpless*, 258 App. Div. 275, 282 N. Y. 647.) III. The policy arguments raised by appellant are insubstantial and at variance with the plain command of the inspection statutes and the policy they represent. Appellant's claim of immunity for all papers of the department of investigation must be rejected. (*People ex rel. Brownell* v. *Higgins*, 96 Misc. 485.)

VAN VOORHIS, J. This appeal concerns whether reports by the commissioner of investigation to the Mayor of New York City must be made public. The contention of appellant is that the commissioner is a confidential assistant to the Mayor, and that

his reports to the Mayor on various aspects of the operation of the city government are intended for the Mayor's eye alone, and are to be made public only to whatever extent the Mayor authorizes. The issue is presented by a motion to dismiss a petition instituting an article 78 proceeding, the object of which is to compel the Mayor to permit plaintiff, as a taxpayer, to inspect a report by the commissioner to the Mayor. The motion to dismiss the petition was denied at Special Term by an order which was affirmed by the Appellate Division, but in a *Per Curiam* opinion which would limit mandatory disclosure to " a final and formal report of the Commissioner of Investigation ". The Appellate Division said: " There are obvious distinctions between papers for use in an investigation and a culminating official report at the conclusion of the investigation. That the papers are free from disclosure does not compel the conclusion either in public policy or legal construction that the final report should be." The reasoning of Special Term would have required testimony and all preliminary steps taken by the commissioner to be publicized. Although what the Appellate Division required to be made public is more limited than Special Term, the order was affirmed inasmuch as the Appellate Division considered that there must be public inspection to the extent indicated above, and that if any inspection could be ordered the motion to dismiss the petition should be denied.

A dissenting opinion was written at the Appellate Division by Mr. Justice BREITEL.

The genesis of this controversy was a letter dated June 27, 1951, written to the Mayor by Alfred E. Santangelo, which contained several charges reflecting upon the conduct of the commissioner of correction. The two most provocative of these charges were that special favors had been granted to a prisoner at Rikers Island, and that the correction commissioner had engaged in anti-Semitism by discriminating against employees in the department of correction.

The petition alleges that in July, 1951, the Mayor directed the commissioner of investigation to conduct an investigation into these charges, that such an investigation was made lasting more than eight months, that the commissioner of investigation delivered a complete report to the Mayor in May, 1952, but that this report has not been made public notwithstanding demands made

June 18 and July 11, 1952, by the American Jewish Congress, and a further demand made by petitioner January 30, 1953. On June 23, 1952, the deputy mayor answered one of the letters from the American Jewish Congress by stating: " The Mayor has requested me to convey to you the information that Commissioner Shiels has filed his report indicating that the proof submitted failed to substantiate any of the charges made. In the absence of evidence sufficient to support the charges, no further action is warranted." Answering the demand by petitioner, the deputy mayor wrote: " In keeping with an opinion of the Corporation Counsel, the reports of the Commission of Investigation to the Mayor are confidential."

The functions, powers and duties of the commissioner of investigation are set forth in section 803 of the City Charter. That section states:

" § 803. *Powers and duties.* — The Commissioner:

" 1. Shall make any investigation directed by the mayor or the council.

" 2. Is authorized and empowered to make any study or investigation which in his opinion may be in the best interests of the city, including but not limited to investigations of the affairs, functions, accounts, methods, personnel or efficiency of any agency."

The following section (804) states that " There shall be a complaint bureau in the department which shall receive complaints from the public." The next section (805) empowers the commissioner of investigation and his deputies to compel the attendance of witnesses, to administer oaths and to examine such persons as he may deem necessary " in public or private hearings ". Section 803-1.0 of the New York City Administrative Code describes the duties of the commissioner in reporting results of investigations, as follows:

" § 803-1.0 *Reports of commissioner.* — The commissioner shall report:

" 1. To the council, the results of any investigation directed by the council.

" 2. To the mayor, the results of all other investigations."

Section 51 of the General Municipal Law declares papers on file in the offices of municipal corporations to be public records,

and provides that they "shall be open, subject to reasonable regulations to be prescribed by the officer having the custody thereof, to the inspection of any taxpayer". The application of this statute is limited, however, by section 893 and section 894 of the New York City Charter, which deal specifically with the same subject. The first of these sections requires heads of departments to furnish copies of papers on demand, and the second is entitled "Inspection by taxpayers of books and papers". The latter section (894) is the one with which we are immediately concerned on this appeal. It states that "All books, accounts and papers in the office of any borough president or any division or bureau thereof, or in any city department or any division or bureau thereof, except the police and law departments, shall at all times be open to the inspection of any taxpayer," subject to reasonable rules in regard to the time and manner thereof. Then follows the last sentence, identical in both sections 893 and 894 of the charter, on which the outcome of this appeal depends, reading as follows: "The provisions of this section shall not apply to any papers prepared by or for the comptroller for use in any proceeding to adjust or pay a claim against the city or any agency or by or for counsel for use in actions or proceedings to which the city or any agency is a party or for use in any investigation authorized by this charter."

In addition to the privacy accorded to the records of the police and law departments, it is thus provided that inspection by taxpayers shall not be mandatory of papers prepared by or for the comptroller for use in proceedings for the adjustment or payment of claims against the city or its agencies, or by or for legal counsel for use in actions or proceedings to which the city or its agencies are parties, or of papers prepared "*for use in any investigation authorized by this charter.*" (Italics supplied.)

The decision of this appeal depends upon the interpretation of the last phrase. It has been construed in different ways by Special Term, by the majority of the Appellate Division, First Department, and in his dissenting opinion by Associate Justice BREITEL. Special Term went farthest in requiring publicity for everything. Citing an English case (*Herbert* v. *Ashburner*, 1 Wils. K. B. 297) Special Term stated that, in general, "A

municipal corporation can have no private books ''. The Appellate Division majority considered that stenographic minutes and other preliminary papers in the commissioner's investigation might be kept private. The point at which Justice BREITEL and the majority of the Appellate Division differed is that he did not recognize the distinction between preliminary proceedings by the commissioner of investigation and what the majority called his final report. Justice BREITEL considered that whatever the commissioner does is, in a sense, preliminary to decisions to be made by the Mayor, and that his entire function in a case like this is to act as a confidential informant to the Mayor. The majority at the Appellate Division thought that preliminary papers were exempted as having been prepared '' for use '' in an investigation, but that the report of the commissioner was not a document prepared '' for use in any investigation '' since it expressed what was described as its final result. Differing from this idea, Justice BREITEL made the following comment: '' The majority of this court distinguished the final report from the intermediate work of the investigation. The statute makes no such distinction, unless one argues that the words ' papers * * * for use in any investigation ' do not include a ' report '. Moreover, the nature of an investigation for purposes of internal administration in a government need not result in reports of a ' final and culminating ' nature. They may be tentative. They may have recommendations relating to a period of time to come. They may have alternatives. They may suggest culpability but lack sufficient proof coupled with a comment that a repetition, if it should occur, of the wrongdoing should be awaited before there be a taking of drastic action.''

Developing this thought, appellant's counsel states in the brief:

'' A report of the Commissioner of Investigation to the Mayor, prior to its transmission to the Mayor's office, is plainly a paper prepared for use in an investigation, since its very purpose is to be used by the Mayor in an investigation ordered by him, or undertaken by the Commissioner of Investigation on his own initiative, subject to the duty to report its results to the Mayor. Transmission to the Mayor does not alter this characteristic of the report. The investigation still continues

and the report is undeniably being used therein by the Mayor while he studies it to determine what action should be taken thereon.

" After examining the report, the Mayor may direct that the investigation be continued or extended, and that further reports be submitted, or that the investigation be held in abeyance pending developments. In all these instances, the report clearly continues to be used in the investigation.

" If the Mayor terminates the investigation after receiving a report, it is not thereby divested of its protected Charter status as a paper prepared for use in an investigation."

In construing these sections of the charter and of the Administrative Code, both sides have outlined the history of the office of commissioner of investigation, and have discussed the probable public policy underlying his functions in order to aid in interpreting these clauses.

Some observations can be made with assurance. Special Term's quoted comment that a municipal corporation can have no private papers is an overstatement, inasmuch as that would fail to concede exemption to records of the departments of police or of law, or of the comptroller in case of proceedings to adjust or pay claims against the city, or of papers prepared for use in investigations authorized by the charter. In these respects, sections 893 and 894 supersede section 51 of the General Municipal Law, and section 1545 of the Greater New York Charter, thus rendering irrelevant such decisions as *Matter of Egan* v. *Board of Water Supply* (205 N. Y. 147) ; *Matter of North* v. *Foley* (238 App. Div. 731) ; *Matter of Ihrig* v. *Williams* (181 App. Div. 865, affd. 233 N. Y. 670) ; *Matter of Becker* v. *Lunn* (200 App. Div. 178) ; *Matter of Sears Roebuck & Co.* v. *Hoyt* (202 Misc. 43) ; *Matter of Blanshard* v. *O'Brien* (N. Y. L. J., Dec. 6, 1933, p. 2113, col. 5). More nearly analogous is section 6 of the Executive Law (the so-called Moreland Act) authorizing the Governor " either in person or by one or more persons appointed by him for the purpose " to examine and investigate the management and affairs " of any department, board, bureau or commission of the state ". Justice BREITEL points out in his dissenting opinion that such reports are not subject to mandatory public inspection. The investigation for the Mayor, which is the subject of this

appeal, was conducted through the examination of witnesses at private hearings, as is authorized by section 805 of the City Charter. Further analogy exists, as Justice BREITEL indicated, with the State office of Commissioner of Investigation created by chapter 887 of the Laws of 1953, adding the present section 11 to the Executive Law. This officer bears a similar relationship to the Governor that the commissioner of investigation does to the Mayor. Subdivision 5 of section 11, thus added to the Executive Law, states that " Any person conducting or participating in any examination or investigation who shall disclose to any person other than the governor or the commissioner the name of any witness examined, or any information obtained or given upon such examination or investigation, except as directed by the governor, shall be guilty of a misdemeanor."

Views of what is the best policy in such a matter bear upon our decision of this appeal only insofar as they may enlighten concerning the probable intention of the Legislature in adopting these provisions of the City Charter and of the Administrative Code. A significant study was made by the Committee on Municipal Affairs of the Association of the Bar of the City of New York, which was published in its December, 1952, Record. This study is entitled " Report on Office of Commissioner of Investigation ", and it states that the committee was instructed to inquire and report as to the propriety and desirability of any changes regarding the status or functions of the commissioner, " and particularly as to reports by the Commissioner to the Mayor ". The report recites the creation of the position in 1873, then known as commissioner of accounts, and states that during the second decade of the existence of the office, the commissioner of accounts became in effect " the Mayor's eye ", serving " principally as a means by which the Mayor could privately obtain accurate information and thus supervise the operations of the city government more effectively. The relation between the Mayor and the Commissioner of Accounts thus became one of special personal confidence; indeed, the Commissioners of Accounts were at that time the only department heads removable at the Mayor's pleasure." The office went into eclipse at about the time of the commencement of World War I, but the report recites its revival in more recent years. Attention is called to

the circumstance that when the 1938 Charter was under consideration, several proposals were made to change the status of the commissioner from the Mayor's eye by making it an independent position. The Bar report continues: "There were proposals for appointment of the Commissioner by the Council; severance of all connection between the Commissioner and the Mayor; and the various other suggestions for institution of investigations and distribution of reports. These ideas did not prevail. Only the provision that the council as well as the Mayor be authorized to direct investigations has survived, and that authority has been exercised in no more than one instance." When the council authorizes an investigation, section 803-1.0 of the Administrative Code directs that the commissioner shall report to the council the results of any investigation directed by the council, but it provides that he shall report the results of all other investigations to the Mayor. In the case of investigations directed by the Mayor, or instituted by the commissioner upon his own initiative, his confidential relationship to the Mayor continues to exist. The Bar Association Committee's report contains this important comment:

"Basically, the Commissioner is and should be a staff assistant to the Mayor. The quality of the City's administration is and should be the responsibility of the Mayor. Giving the Commissioner a quasi-independent status would interfere with the effective performance of the duties of a well-intentioned Mayor and would furnish one who is not well-intentioned with an opportunity to evade his proper responsibility.

"The Committee has concluded that a legislative requirement that reports of the Commissioner be public documents, in the sense that they would be available for general inspection as soon as rendered, would tend to hamper unduly the proper functioning of his Department. In many cases, it appears that inefficiency could be corrected by proper action by the Mayor without the loss of morale in the affected department which would inevitably follow publication. Moreover, it might well be that erroneous, trivial, or incompletely explored information might be unfairly exploited by political opponents.

"The Committee is also persuaded that it would be unrealistic to require that all reports to the Mayor or reports to the Commissioner from within his Department be in writing."

The interpretation of these statutes by the Committee on Municipal Affairs of the City Bar Association, although in no sense binding upon the courts, is well reasoned and clearly expressed, and reflects careful study by a committee of competent lawyers of both parties who have had wide experience in the municipal field. It is of some note that these lawyers exhibited no doubt that the commissioner is a confidential assistant to the Mayor (except in cases where he is directed to make reports by the city council) and that his reports to the Mayor are submitted under the seal of privacy unless the Mayor decides to reveal them. The committee recommended against a legislative enactment changing the existing law by requiring that reports of the commissioner be made available for general inspection when rendered.

Seidman in a book entitled " Investigating Municipal Administration " (1941) points out at pages 30, 93 and 123 that for a limited period prior to 1938, the City Charter provided that reports of investigations be submitted to the board of aldermen as well as to the Mayor (Greater New York Charter, § 119). This was interpreted as having the effect of making reports of the commissioner public documents. In preparing the earlier drafts of chapter 34 of the 1938 Charter, concerning the department of investigation, the charter revision commission at first carried forward the requirement of section 119 of the Greater New York Charter that reports of the commissioner of accounts should be submitted to the board of aldermen as well as to the Mayor (Documents of New York City Charter Revision Commission, 1936, vol. 9, § 9e, Columbia Law School Library, Cat. No. S. N. Y. 81, 1934-1936). The commissioner of accounts then appeared before the charter revision commission and pointed out that the requirement of the old charter that reports be presented to the board of aldermen meant, according to his understanding, that such reports had to be made public at the completion of an investigation (Minutes of Charter Revision Commission, Oct. 31, 1935, p. 5). This result was apparently thought to be undesirable by the charter revision commission when, in the preliminary draft and in the final draft of chapter 34 of the 1938 Charter, it omitted any requirement that reports be submitted either to the Mayor or to the city council. The provision

of section 803-1.0 of the Administrative Code that reports be made to the council where the council has instituted the investigation was a concession to the views of those who considered that all of the commissioner's reports should be made public, yet it fails of that effect except in instances where reports by the commissioner have been made, as they rarely are, at the instigation of the city council. When investigations have been instituted at the request of the Mayor or initiated by the commissioner himself, the report is required by section 803-1.0 of the Administrative Code to be made to the Mayor alone, thus obviating the resultant publicity where it had also been required to be rendered to the board of aldermen. Of course, sections 893 and 894 of the present charter control, and they require that inspection by taxpayers be allowed except as there limited. The question before us is whether the report in this case is exempt from inspection as having been prepared for use in an investigation, within the language of section 894. Nevertheless the history sheds light upon the construction to be placed upon that provision.

The history reveals the origin of the distinction drawn by the majority at the Appellate Division between stenographic minutes of testimony and other papers used preliminarily by the commissioner of investigation, and his '' culminating '' report to the Mayor. That distinction would not have been likely to have been suggested by the language of sections 893 or 894 of the present charter, exempting papers prepared '' for use in any investigation authorized by this charter.'' In any event it is a distinction which arose before that phrase existed, created by the courts to prevent giving guilty parties advance notice to cover up their tracks. This distinction avoided disclosure to people being investigated, at least of stenographic minutes and other preliminary papers of the commissioner, notwithstanding the apparently mandatory language of section 1545 of the Greater New York Charter. It was in that context that Mr. Justice COHN wrote as he did at Special Term in the case of *Matter of Blanshard* v. *O'Brien* (N. Y. L. J., Dec. 6, 1933, p. 2113, col. 5, *supra*). In those days there was no statutory proviso protecting against public disclosure any papers which had been prepared '' for use in any investigation authorized by

this charter ''. No such phrase was in the statute expressly preventing the compulsory exhibition of any records of the commissioner to persons who might have ulterior reasons for learning how much was known about their activities under investigation, or what future action might be taken against them on the basis of the commissioner's reports, and under these circumstances the courts were loath to compel the disclosure of more than was absolutely required. The question on this appeal is whether, by inserting this phrase in sections 893 and 894 of the current charter, it was intended to embody or to render unnecessary this distinction previously drawn by the courts. If the clause had been intended as merely declaratory of this judge-made distinction, there would have been no need to insert it. The courts had already created it in applying section 1545 of the Greater New York Charter, and section 51 of the General Municipal Law which contained no such language. This distinction manifestly was created in the thought that the commissioner of accounts, as this officer was then called, did in reality occupy a confidential relationship to the Mayor, and that as much of his work as was compatible with the language of the City Charter should be kept secret except at the Mayor's election. The now superseded requirement that the commissioner report to the board of aldermen, said the Bar Committee Report, '' was studiously ignored on the ground that compliance would give warning to malefactors, and, by making the reports public records, would unfairly publicize irregularities committed without thought of wrong.'' Now that the requirement that the commissioner's reports of investigations shall always be rendered to the board of aldermen or the city council has been eliminated, there is no further occasion to preserve this refinement classifying separately papers used during the conduct of an investigation and its issue in a report to the Mayor.

Any investigation by the commissioner, even including his report to the Mayor, is preliminary in a certain sense, as Justice BREITEL stated, in that the object is to keep the Mayor informed concerning the operation of the different branches and agencies and the functioning of the personnel of the city government. The vital purpose of this officer is, and always was, to act as the Mayor's eye. There are likely to be occasions when the public

disclosure of such reports would interfere with further action to be taken by the Mayor, or some other branch of the city government, or when it would, as the Bar Association's Committee has pointed out, unfairly subject irregularities that have been committed without actual wrong to captious criticism. There are certain to be times, also, when actual wrong can most effectively be prevented or righted by executive action taken outside of the glare of the kleig lights.

The Mayor of New York City is vested with large executive responsibility. He is in a position where he is often called upon also to recommend legislation, municipal and State. The object in providing him with the services of a confidential officer of this kind was to help and not to embarrass him. If all of the reports of the commissioner are required to be made public, they will become insignificant in content, and the usefulness of the commissioner's function will be likely to fail. That, at least, appears to be the theory on which the existing provisions of the charter and Administrative Code have been prepared.

If the commissioner is to be of value, his reports will tend to criticize the city administration rather than to praise it. It was evidently anticipated that such criticism would be constructive, in order that the Mayor might adopt helpful suggestions and make wise decisions on the basis of detailed facts submitted to him by the commissioner regarding delicate and unsatisfactory situations. The theory of these statutes, which we have to construe, is that this function can best be performed if the commissioner is held to be a confidential informant of the Mayor.

The broad extent of the commissioner's powers is illustrated by the recent case of *Matter of Dairymen's League Co-op. Assn.* v. *Murtagh* (274 App. Div. 591, affd. 299 N. Y. 634), where the commissioner was held to have been empowered to inquire into the names and addresses of all of the retail and chain store customers of a distributor of milk, the price per quart and the number of quarts sold, or rebates paid, and the books and records of this dealer had to be produced for the purposes of such investigation. Concerning all of this, and much more, the commissioner is empowered to inquire. It is no answer to say that the commissioner will be careful of what he puts into his reports. It is not his function to decide what information should

or should not be made public. His function is to assemble and transmit to the Mayor all of the facts which the Mayor may or may not consider important in making the responsible decisions which he is required to make as the chief executive officer of the city.

The circumstance should not be ignored that under the Subversive Conduct Law (L. 1951, ch. 233, §§ 1, 8; Civil Service Law, § 12-a), the commissioner of investigation is called upon to inquire into security risks, and that the State Civil Service Commission is said to have designated twenty-six agencies of the City of New York as security agencies performing functions vital to the defense of the United States. If the order appealed from be affirmed, then the reports of such investigations, as well as of all other types of investigation by the commissioner, receive mandatory publicity.

It is a familiar canon of construction that statutes are to be interpreted so as to fulfill policies which the Legislature evidently had in mind. Some indication of that may be found in the recently adopted amendment to the Executive Law creating the office of State Commissioner of Investigation for the purpose of reporting to the Governor. This act (L. 1953, ch. 887), as has been stated above, leaves no uncertainty that the reports of this officer to the Governor are to be disclosed only at the election of the latter. The State Commissioner, bearing the same title and following the prototype of the commissioner of investigation of New York City, is not likely to have been created in a different image in this respect.

Analogies to the legislative policy in this regard can readily be found in other fields. There is no mandatory publicity of all of the records of departments of police or of law, nor of papers prepared for the city comptroller for use in adjusting or contesting claims, nor in the case of welfare records, nor of certain other kinds of municipal records. The same is true of proceedings before grand juries, of Federal Bureau of Investigation investigations, and many income tax records. The result would be different if the commissioner of investigation were a different kind of office, that is to say, if instead of being a confidential aid to the Mayor, he were an independent public officer.

The motion by appellant to dismiss the petition under section 1293 of the Civil Practice Act should be granted.

The order of the Appellate Division should be reversed, without costs, and the matter remitted to Special Term for further proceedings in accordance with this opinion; the question certified is answered in the negative.

LEWIS, Ch. J., CONWAY, DESMOND, DYE, FULD and FROESSEL, JJ., concur.

Order reversed, etc.