Conway, Ch. J.
We are here concerned with the question of whether petitioner is entitled to an order reinstating him to the position of subway conductor in the New York City Transit System. He has been discharged from such position by the respondents, constituting the New York City Transit Authority, upon the ground that a reasonable basis exists for the belief that, because of his doubtful trust and reliability, his employment in the position of conductor endangers the security or defense of the nation and the State.
On September 14, 1954, pursuant to instructions received from his immediate superior, petitioner appeared at the office of the commissioner of investigation of the City of New York for the purpose of answering questions in an investigation being conducted by the commissioner. After he was sworn, petitioner was asked whether he was then a member of the Communist party. He refused to answer upon the ground that to do so might tend to incriminate him and that, therefore, he was entitled to claim the privilege against self incrimination afforded him under the Fifth Amendment to the United States Constitution.
After being advised of the provisions of the Security Risk Law (L. 1951, ch. 233, as amd.) and being given an opportunity to reconsider his refusal, he reappeared at the office of the Department of Investigation on September 21, 1954, at which *361 time he requested additional time to engage counsel. On September 30, 1954 he appeared, accompanied by counsel who requested and was granted a further adjournment. On October 8, 1954 petitioner again appeared with counsel and once more refused to answer questions as to whether he was then or had been a member of the Communist party.
The foregoing facts were brought to the attention of the Transit Authority. Thereafter, on October 21,1954, the Authority adopted a resolution suspending petitioner, without pay, effective at the close of business on October 22, 1954. The resolution was sent to the petitioner with a covering letter. Both the letter and the resolution recited the reasons for the action taken and both notified the petitioner that he had the opportunity, within 30 days after notification, to submit statements or affidavits to demonstrate why he should be reinstated or restored to duty.
By report dated November 22,1954, the executive director and general manager notified the Authority that, during the 30-day period allowed him, neither petitioner, nor anyone on his behalf, had communicated with the Authority or the Department of Investigation of the City of New York, and that further investigation had revealed activities on the part of the petitioner which gave reasonable grounds for belief that he was not a good security risk. The Authority then found, upon review, that, upon all the evidence, reasonable grounds existed for the belief that because of his doubtful trust and reliability, the employment of petitioner in the position of conductor endangered the security or defense of the nation and the State. Accordingly, the employment of petitioner was terminated at the close of bu'siness on November 24, 1954.
The Security Risk Law, under which petitioner was discharged, was adopted in 1951 and has been extended so that its terminal date now is June 30, 1957 (L. 1956, ch. 310), unless extended again.
It will be helpful if we here summarize the various sections of the Security Risk Law.
The first section — section 1 — is the declaration of the Legislature’s findings and intent. It states, in part, that the Legislature 11 * * * finds that the employment of members of subversive groups and organizations by government presents a grave peril to the national security. These groups and organiza *362 tions are frequently well organized and rigidly disciplined, and often under the direction and control of a foreign power are dedicated to the task of bringing about the overthrow of existing legally constituted government by any available means, including force if necessary. If members of such organizations * * * concerning whom reasonable grounds exist for the belief that, because of doubtful trust and reliability, their employment in public service in security positions would endanger the security or defense of the nation and the state, are permitted to hold public office and employment, their retention in security positions during the existence of a national emergency would imperil or endanger the safety, welfare or best interests of the armed forces, the civilian defense forces and the people of this state and of the United States. * # * ”
Section 5 provides for the suspension and removal or transfer of an employee under the statute. The provision conferring this authority is as follows: ‘ ‘ Any public officer, board, body or commission of the state or of any civil division thereof authorized by law, rule or regulation to exercise the power of appointment may, in his or its absolute discretion and when deemed necessary in the interests of national security, transfer, subject to the approval of the civil service commission having jurisdiction, to a position other than a security position or to an agency other than a security agency, or suspend without pay any officer or employee under his or its appointive jurisdiction occupying a security position or a position in a security agency, whenever such officer, board, body or commission shall find, after proper investigation and inquiry, that, upon all the evidence, reasonable grounds exist for belief that, because of doubtful trust and reliability, the employment of such person in such position would endanger the security or defense of the nation and the state.”
Section 4 contains the provisions as to disqualification of applicants or eligibles.
The balance of the suspension and dismissal section (§ 5) contains the provisions for notification to the employee of the action taken and of the steps he may then take. They are as follows: “ The officer or employee with respect to whom such action was taken shall be notified that such action was taken pursuant to this section and, to the extent possible without disclosing confidential sources of information of law enforcement agencies, or agencies empowered or required by law to investí *363 gate subversive activities or disloyalty, the reasons for such action. Within thirty days after such notification, such person shall have an opportunity to submit statements or affidavits to show why he should be reinstated or restored to duty. Following such further investigation and review as he or it shall deem necessary, the officer, board, body or commission taking such action shall affirm the transfer or terminate the employment of such officer or employee if he or it shall find, that, upon all the evidence, reasonable grounds exist for the belief that, because of doubtful trust and reliability, the employment of such person in a security position or in a security agency would endanger the security or defense of the nation and the state. If the officer, board, body or commission finds no reason to warrant the transfer or removal of such officer or employee, he shall be restored to his position and if such officer or employee has been suspended from his position, he shall, upon restoration, be entitled to back pay for the period of his suspension.”
'Section 6 provides for appeal to the State Civil Service Commission by any person who believes himself aggrieved by a determination under sections 4 or 5, and the proceedings to be had upon such appeal.
Section 7 deals with evidence which may be considered in proceedings under the act. It declares that finding of disqualification (under § 4) and a determination of suspension, removal or transfer from the position (under § 5) may be based upon evidence of previous conduct, which may include “ to the extent deemed appropriate, but shall not be limited to evidence of ” four forms of conduct. One of these is ‘£ membership in any organization or group found by the state civil service commission to be subversive.”
Section 8 provides that a subversive group or organization, as used in the law, shall be one found by the State Civil Service Commission, after inquiry and appropriate notice and hearing, to advocate the overthrow of the government by force and violence, or so designated by the United States Attorney G-eneral or by the State Board of Regents pursuant to the Feinberg Law (Education Law, § 3022), provided these designations were made upon notice to the organization or group and opportunity afforded to answer.
Section 2 defines ££ security agency ” as meaning: “ * * * any department, bureau, agency, office or unit of government *364 (1) wherein functions are performed which are necessary to the security or defense of the nation and the state; or (2) where confidential information relating to the security or defense of the nation and the state may be available.”
The section defines “ security position ” as: “ * * * (1) any office or position in the public service which requires the performance of functions which are necessary to the security or defense of the nation and the state; or (2) any office or position in any public agency or department where confidential information relating to the security or defense of the nation and the state may be available. ” ■
Section 3 provides how it shall be determined what is a security agency or security position: ‘ ‘ Upon its own initiative or whenever requested by the head of any department, bureau, division or other agency of the state government, or by any municipal civil service commission, or board, or body, authorized by law to conduct examinations and certify eligibles for positions in the service of the state or its civil divisions, the state civil service commission shall determine whether or not (1) an agency is a security agency within the meaning of section two (a) of this act, or (2) a position is a security position within the meaning of section two (b) of this act. Such determination by the state civil service commission shall be subject to review by the courts in accordance with the provisions of article seventy-eight of the civil practice act. ’ ’
On November 23, 1953 the State Civil Service Commission declared the New York City Transit Authority to be a security agency within the meaning of the Security Risk Law. On March 24, 1954 by resolution the commission listed the Communist party of the United States and of the State of New York as subversive within the meaning of the Security Risk Law. This was based upon and was an adoption of such listing of the Communist party by the State Board of Regents under the Feinberg Law.
The facts as to petitioner’s discharge under the Security Risk Law have been set forth above.
On this appeal the following basic questions are presented:
(1) "Whether the New York City Transit Authority is a “ board, body or commission of the state or of any civil division thereof ” within the intendment of the Security Risk Law and *365 whether the city commission of investigation had jurisdiction to conduct the inquiry;
(2) Assuming that the answer to (1) he in the affirmative, whether the Transit Authority was properly designated a “ security agency ”;
(3) Assuming that the answer to (2) be also in the affirmative, whether the Security Risk Law authorizes the Transit Authority to suspend and discharge one occupying the position of subway conductor in such security agency merely upon a showing that, when asked if he was then a member of the Communist party, he refused to answer, and then gave as a reason for so refusing, that to answer might tend to incriminate him within the meaning of the Constitution, and
(4) Assuming that the answer to (3) be also in the affirmative, whether the Security Risk Law is constitutional.
We shall treat of the questions seriatim.
The New York City Transit Authority was created by the Legislature as a “ body corporate and politic constituting a public benefit corporation”. (Public Authorities Law, § 1801, subd. 1.) It operates the transit facilities owned by the City of New York. It is comprised of three members, one of whom is appointed by the Mayor of the City of New York, one by the Governor of the State and the third member (who shall be chairman of the board) appointed by the first two members after their appointment and qualification. Neither the chairman nor any member shall hold any other paid public office or employment under the Government of the United States, of the State of New York or of the City of New York. The Authority performs the vital function previously vested in the Board of Transportation of the City of New York, which was a city agency and eligible to be declared a security agency.
It is clear that the danger to government to be anticipated from the activities of a subversive individual in the employ of the Transit Authority is no different from the danger to government to be anticipated from such individual if he were still in the employ of its predecessor body, the Board of Transportation. We think it also clear that the purpose of the Legislature in enacting the Security Risk Law was to protect the government and those public authorities performing vital functions of government from the peril of infiltration of subversive individ *366 uals into the public service. Accordingly, in our judgment, the Transit Authority is a ‘‘ board, body or commission of the state or of any civil division thereof ” within the intendment of the Security Bisk Law.
The petitioner argues that the city’s interest in the transit system is that of lessor of the physical properties only, and that such interest does not justify its interrogation of employees of the Transit Authority. We do not agree.
The City of New York is empowered, through the commissioner of investigation, to investigate and inquire into all matters of concern to the city or its inhabitants (see G-eneral City Law, § 20, subd. 21; § 23, subd. 1; New York City Charter, § 803). As we have said, the City of New York owns the rapid transit facilities which constitute the New York City Transit System. In June of 1953 those facilities were leased by the city to the Transit Authority for a period of 10 years. Under the lease the city is required to pay the costs of the capital improvements on the transit system and, so, the city has a proprietary interest in preserving and protecting those facilities from sabotage or destruction. Moreover, it cannot be doubted that the very existence of the city is dependent upon the safe and uninterrupted operation of the transit system. Certainly, an investigation to determine whether employees of the transit system are members of subversive organizations or are of doubtful trust and reliability is “ in the best interests of the city ” (New York City Charter, § 803, subd. 2). That being so, the investigation here involved was properly initiated by the commissioner of investigation (see Matter of Cherkis v. Impellitteri, 307 N. Y. 132, 148).
The Public Authorities Law confers upon the Transit Authority the right to avail itself of the services of the officers and agencies of the city government (see Public Authorities Law, § 1803, subd. 3, par. b). The Authority must be said to have exercised its right to make use of the services of the commissioner of investigation and, in effect, to have authorized said commissioner to conduct the investigation on its behalf, when it directed the petitioner to appear before the commissioner to answer questions designed to ascertain whether he was of doubtful trust and reliability. Under the Security Bisk Law the Authority is not required to make its determination upon evi *367 dence developed as a result of its owu investigation — it has the right to consider and weigh evidence from any source.
We turn now to the question of whether the Transit Authority was properly designated a “ security agency.”
The law defines the term “ security agency” as follows: “ (a) The term ‘ security agency ’ as used in this act shall mean any department, bureau, agency, office or unit of government (1) wherein functions are performed which are necessary to the security or defense of the nation and the state; or (2) where confidential information relating to the security or defense of the nation and the state may be available. ’ ’
The Transit Authority performs a function necessary to the security or defense of the nation and the state. This fact was vividly demonstrated recently when certain New York City subway motormen went out on strike. Mr. Justice Ltjpiano, Special Term, New York County, in issuing an injunction against those motormen, aptly pointed out (New York City Tr. Auth. v. Loos, 2 Misc 2d 733, 738):“ It is easy to forget, while the subways are running, that there is room for motor vehicles on the streets only because millions travel by subway; for if all persons had to use surface transportation, the bridges and tunnels and main highways would soon be hopelessly clogged. New York with its immense territory and its five separate boroughs, all protected by unified police and fire departments and having many other integrated services, is dependent for its very life and daily functioning, and for the immediate safety of its 8,000,000 inhabitants, on rapid transit facilities which are necessarily used by nearly all persons engaged in all of its governmental and other vital functions. Whatever may be the case elsewhere, and under other conditions, whatever may have been the case in other times, here and now, and for this city, the operation of the rapid transit facilities is a basic governmental service indispensable to the conduct of all other governmental as well as private activities necessary for the public welfare. It is worth re-emphasizing that the subways are the city’s arteries upon which its life and daily living depend. * * * ”
We consider it clear, therefore, that the Transit Authority has been properly denominated a “ security agency ”.
The Appellate Division, in concluding that the petitioner’s refusal to answer the question posed constituted sufficient justification for his dismissal under the Security Risk Law, wrote:
*368 “We apprehend that if a statute, such as the Los Angeles ordinance* permitting discharge of a public employee for refusal to execute an affidavit of the character there required, is valid and justifies his discharge for that reason, it is proper for a security agency, charged with the duty of determining whether an employee is of doubtful trust and reliability from a security standpoint, to inquire into those matters and, if the employee refuses to answer, it may not be said that the agency is not empowered to find that such refusal, in and of itself, furnishes reasonable grounds for a belief that he is not a good security risk. It is our view that the correct construction has been placed on the Security Risk Law by the Transit Authority and by the Special Term. ’ ’
Petitioner contends that the Legislature in enacting the Security Risk Law intended that a security risk agency must have a hearing at which it introduces evidence against the employee before it may find the employee to be a security risk and that it may not discharge the employee for mere failure to answer the question as to Communist party membership. The respondents, on the other hand, contend that the refusal to reply to the crucial question as to Communist party membership is ‘ ‘ evidence ” of “ doubtful trust and reliability ’ ’, which is the ground for discharge under the Security Risk Law. They point out that the petitioner was not discharged on the ground that he was a Communist party member. He was discharged for having *369 created a doubt by declining to answer whether he was or was not a member.
We agree with the respondents.
It seems to us that it would be more clear if we suppositiously divided the conduct of petitioner into two parts. The first, when he was asked by his employer whether he was then a member of the Communist party. That question he refused to answer. He then left the room. Certainly by that conduct he would have given evidence of his own untrustworthiness and unreliability. Suppose then, as the second part of his conduct, he returned five minutes later and told the commissioner of investigation that he had refused to answer his question because to do so might tend to incriminate him. May not the employer discharge an employee who refuses to answer his proper question? If the petitioner, in the case supposed, had not returned to the commissioner five minutes later and given a reason for his conduct, we think all would agree that he was properly discharged. Does it change the situation because he returns to say that he refused to answer because to do so might tend to incriminate him? Does that explanation destroy the evidence which he has given to his employer of his untrustworthiness and unreliability as a security risk? Does the explanation require that the employer consider without any doubt that the employee by his explanation has again become trustworthy and reliable as a security risk as a matter of law? We think not.
The intent of the Security Risk Law was to set up a removal procedure which would provide a more ready means of removing security risks from public service than sections 22 or 12-a of the Civil Service Law. This is apparent from the fact that even under the Civil Service Law an employee, refusing to answer questions put to him by his employer pertaining to his official conduct, may be removed, after a hearing, under a charge of insubordination without any showing by the employer of the information which prompted the inquiry.
The contentions of the petitioner (1) that the Security Risk Law is unconstitutional because an emergency ho longer existed in 1954 when the petitioner was dismissed since the Korean War had ended and (2) no emergency could conceivably justify the dismissal of the petitioner because his position as a conductor could have no rational connection with national security, are untenable.
*370 As to (1) all that need be said is that the wisdom of the Legislature in extending the Security Risk Law beyond the period of the Korean War has been confirmed by world events transpiring since the Korean Truce.
As to (2) we are in accord with respondents that the importance of the petitioner’s position to the security of the State and of the City of New York can be readily seen when it is considered that in modern warfare the civilian population may well be a prime target. A bombing raid on New York City would undoubtedly be planned for a time when the maximum number of people would be in the city. The most important facility for the evacuation of the people would be the subway system. If the petitioner were a member of the Communist conspiracy he would, as an employee of the transit system in charge of a train, as conductors are, be a very real threat to the security of the State and of the city.
It may be argued that one conductor can do very little harm. The answer to that argument, however, is to be found in the words of Mr. Justice Jackson in his concurring opinion in Dennis v. United States (341 U. S. 494, 564): “ The Communist Party, nevertheless, does not seek its strength primarily in numbers. Its aim is a relatively small party whose strength is in selected, dedicated, indoctrinated, and rigidly disciplined members. From established policy it tolerates no deviation and no debate. It seeks members that are, or may be, secreted in strategic posts in transportation, communications, industry, government, and especially in labor unions where it can compel employers to accept and retain its members. It also seeks to infiltrate and control organizations of professional and other groups. Through these placements in positions of power it seeks a leverage over society that will make up in power of coercion what it lacks in power of persuasion.” (Emphasis supplied.)
The final question pertains to the constitutionality of the Security Risk Law, as thus construed and applied to petitioner.
The petitioner contends that the case of Slochower v. Board of Educ. (350 U. S. 551) is controlling authority for the proposition that the Security Risk Law, as so construed, is unconstitutional.
*371 In distinguishing the Slochower case, the majority of the Appellate Division concluded that the holding there was merely that a teacher in a city college, entitled to tenure, and who could be discharged only for cause and after notice, hearing, and appeal, could not be mandatorily and summarily dismissed solely on the ground that he invoked the protection of the Fifth Amendment before a Congressional committee conducting an inquiry not directed at the property, affairs, or government of the city or the official conduct of city employees. In further distinguishing the Slochower case, the Appellate Division said, in part: “ * * * We apprehend that in view of the manner in which the court stressed the 1 remoteness of the period to which they [the questions] are directed,’ the failure of the statute to provide an opportunity to explain the reason for refusal to answer and, more particularly, the nature of the inquiry being conducted by the Federal committee, that decision must be strictly limited to its own peculiar facts. The reference to the Garner case is some indication that, had Professor Slochower’s refusal to answer occurred before a duly constituted body investigating the affairs of the board of higher education or of Brooklyn College, a different result would have been reached even under section 903 of the charter.”
We believe that the Appellate Division has properly distinguished the Slochower case (supra) from the present case. In that case the majority of the Supreme Court said (350 U. S. 551, 558):
'“As interpreted and applied by the state courts, it [New York City Charter, § 903] operates to discharge every city employee who invokes the Fifth Amendment. In practical effect the questions asked are taken as confessed and made the basis of the discharge. No consideration is given to such factors as the subject matter of the questions, remoteness of the period to which they are directed, or justification for exercise of the privilege. It matters not whether the plea resulted from mistake, inadvertence or legal advice conscientiously given, whether wisely or unwisely. The heavy hand of the statute falls alike on all who exercise their constitutional privilege, the full enjoyment of which every person is entitled to receive. Such action falls squarely within the prohibition of Wieman v. Updegraff, supra.
*372 “ It is one thing for the city authorities themselves to inquire into Slochower’s fitness, but quite another for his discharge to be based entirely on events occurring before a federal committee whose inquiry was announced as not directed at ‘ the property, affairs, or government of the city, or * * * official conduct of city employees.’ In this respect the present case differs materially from Garner, where the city was attempting to elicit information necessary to determine the qualifications of its employees. Here, the Board had possessed the pertinent information for 12 years, and the questions which Professor Slochower refused to answer were admittedly asked for a purpose wholly unrelated to his college functions. On such a record the Board cannot claim that its action was part of a bona fide attempt to gain needed and relevant information.”
Here, the city was conducting an investigation to determine . whether -any employees of the Transit Authority were of doubtful trust and reliability; such investigation was properly instituted in the best interests of the city; the question asked was not remote, it was as to petitioner’s then membership in the Communist party — a continuing conspiracy against our form of government; no inference of membership in that party was drawn from petitioner’s refusal to reply to the question asked and, finally, the petitioner was given an opportunity to explain why he had chosen not to answer the question. Petitioner was not discharged for invoking the Fifth Amendment; he was discharged for creating a doubt as to his trustworthiness and reliability by refusing to answer the question as to Communist party membership.
In the Slochower case it was the plea of the Fifth Amendment, and that alone, causing automatic dismissal Avhich the Supreme Court condemned. The Security Risk LaAv does not so operate. "When the employee refuses to tell his employer Avhether he is a member of the Communist party, surely he is giving evidence of “ reasonable grounds ” for doubt as to whether, as Mr. Justice Brenner, said in the Special Term opinion, he “might be ” a member; he is giving “ reasonable grounds ” for “ doubt ” about his trustworthiness and reliability as a security risk. If, in refusing, the employee injects his claim of privilege under the Fifth Amendment, that circumstance is incidental or *373 additional. The dismissal is still proper for refusing that vital, fundamental information. Were that not so, this would he the result: An employee may be dismissed for refusing to give information as to whether or not he is a Communist party member (Garner v. Los Angeles Bd., supra), but if with his refusal he draws into or adds to his words of refusal a claim that to answer might tend to incriminate him and he, therefore, claims the privilege to refuse to answer under the Fifth Amendment to the United States Constitution, he may not be dismissed. That cannot be.
The petitioner also argues that he asserted his constitutional privilege with respect to a Federal crime and as a part of his national citizenship so that his dismissal abridged his privileges and immunities as a citizen of the United States. It seems to me that such an argument is untenable in a situation such as this where the employee uses the privilege to thwart his employer in ascertaining whether or not he is a member of a criminal conspiracy. In the Slochower case (supra), as we have pointed out, the Supreme Court indicated that when the questions are asked by the city the employee has an obligation to answer.
The order of the Appellate Division should be affirmed, with costs.

 In Garner v. Los Angeles Bd. (341 U. S. 716), the Supreme Court of the United States upheld an ordinance of the City of Los Angeles which required every employee to execute an affidavit, stating whether or not he was or ever had been a member of the Communist party or the Communist Political Association. Mr. Justice Clark, writing for the court, said (p. 720):
“ The affidavit raises the issue whether the City of Los Angeles is constitutionally forbidden to require that its employees disclose their past or present membership in the Communist Party or the Communist Political Association. Not before us is the question whether the city may determine that an employee’s disclosure of such political affiliation justifies his discharge.
“We think that a municipal employer is not disabled because it is an agency of the State from inquiring of its employees as to matters that may prove relevant to their fitness and suitability for the public service. Past conduct may well relate to present fitness; past loyalty may have a reasonable relationship to present and future trust. Both are commonly inquired into in determining fitness for both high and low positions in private industry and are not less relevant in public employment. The affidavit requirement is valid.” This reasoning, it seems to us, is determinative of the case presently before us.