Carman F. Ball, J.
Respondents move for an order (1) to quash a subpoena duces tecum requiring the respondents to turn over to the petitioner in the Special Wyoming County Grand Jury all of the files and records accumulated and compiled by the respondents in connection with their investigation and final report of the so-called Attica uprising; and (2) to permanently enjoin Robert E. Fischer and his employees or agents from further attempting to obtain possession of the citizens committee files (which committee is commonly known as the “ McKay Commission ”) who are the respondents.
The petitioner served an order to show cause asking for an order enjoining the respondents from destroying or otherwise disposing of their files and records.
Prior to the return date of the motion, George D. Zuckerman, Assistant Attorney-General, appeared on behalf of the Governor, Nelson A. Rockefeller, amicus curiae, in support of the motion to quash the subpoena. Barbara Handschu and William M. Kunstler appeared on behalf of plaintiff-intervenors, prisoners in Attica, and Edward I. Koren representing the New, York Civil, Liberties Union and the National Prisoner Project of the *597 American Civil Liberties Union, amicus curiae, in support of the motion to quash.
In addition, the plaintiff-intervenors support the petitioner’s motion to preserve the commission’s files, but ask that the court preserve these files, rather than the commission.
On September 9,1971 approximately 1,200 of the 2,000 inmates of the New York State Correctional Facility at Attica, using force and homemade weapons of various sorts, took possession and control of a portion of the facility. They also captured and detained as hostages a number of correctional officers (hereinafter sometimes referred to as “guards”). They also made many demands on the authorities, threatening to harm or kill the hostages unless their demands were granted.
The uprising lasted until September 13,1971, when the authorities concluded that further negotiations with the rebellious inmates were not going to be fruitful. The authorities thereupon regained possession and control of the facility and subdued the uprisers by the use of force, including the use of firearms by State Troopers, guards and other law enforcement agencies of the State. Forty-three men were killed (including inmates and hostages) and about 80 others were wounded. In addition, considerable damage and destruction of property resulted.
The events that took place at Attica generated State-wide and national public interest with coverage from newspapers and other news media.
During the uprising, and particularly after the uprising had been quelled, there was considerable criticism from many quarters because the Governor had declined to appear in person at the facility in order to participate personally in negotiations as demanded by the rebellious inmates and as he had been urged to do by some public officials, observers and news media. There was also considerable criticism of the conditions existing at the facility concerning which the inmates had been complaining; criticism of the highest officials of the Correction Department, as well as the men in charge of the Attica facility, including the guards; and there had been considerable discussion and criticism as to whether it had been actually necessary to use firearms to regain possession and control, and whether, in any event, excessive force had been used. There was doubt whether some of the hostages had been killed by the inmates, or by the gunfire used by the State forces. There were also rumors and allegations that physical reprisals had been resorted to by the guards against the inmates after the uprising had been subdued.
At the request of the District Attorney of Wyoming County, in which county the Attica Correctional Facility is located, Gover *598 nor Rockefeller, pursuant to section 63 of the Executive Law, ordered the Attorney-General of the State of New York to supersede the said District Attorney and to convene a Special Grand Jury for Wyoming County for the purpose of investigating the events leading up to, taking place during and following the uprising, in order to determine whether and by whom criminal acts, in violation of the Penal Law of the State of New York had been committed, and if indictments were to be forthcoming, to prosecute the same. The Attorney-General, in turn,. appointed and designated Hon. Robert E. Fischer as a special Deputy Attorney-General to be in charge of the investigation, and to act in the capacity of superseding District Attorney.
On November 19, 1971 a Grand Jury, which is still in session, was duly impaneled for the County of Wyoming to inquire into the criminal acts committed at.the Attica Correctional Facility in said county during the said period of September 9 through September 13,1971 under the applicable provisions of the Penal Law and the Criminal Procedure Law of the State of New York.
The Governor stated that it was in the public interest that a full, complete and impartial investigation and report was necessary of the conditions, circumstances and events leading up to and which had occurred during the episode and after the uprising had been quelled. He then requested the Chief Judge of the Court of Appeals of the State of New York and each of the Presiding Justices of the four Appellate Divisions of the State to recommend members of a citizens committee to conduct such an investigation and make such a report.
The said members of the judiciary named and recommended nine prominent citizens, representing various-.segments of the population of the State.
Thereafter, pursuant to the provisions of the so-called More-land Act, section 6 of the Executive Law of the State of New York, the Governor appointed the recommended individuals as members of the New York State Special Commission on Attica, (the McKay Commission), by order dated November 15,1971, to conduct “a full and impartial investigation and complete report of the facts and circumstances leading up to, during and following the events that occurred at the Attica Correctional Facility between, on or about September 9,1971 and September 13,1971.”
The commission appointed a staff and conducted public hearings, several private hearings, and many private informal interviews. Information was obtained from almost 3,000 persons. These included the Governor of the State, the Copamissioner of Correction and other high State officials, inmates, guards, State *599 police, and others who had participated in the putting down of the uprising and gaining control of the facility; also observers who had participated in the negotiations for possible settlement, physicians and others. Less than 5% of the interviews were transcribed stenographically; the others, along with the impressions of the witnesses, were summarized by lawyers and investigators. The bulk of the commission’s files consist of the handwritten notes of these interviews.
The commission, pursuant to section 73 of the Civil Rights Law, passed a resolution providing that the records of its private interviews were to remain confidential.
Those who gave information privately were assured by the commission, or its staff members, that their identities and the information furnished by them would be kept confidential, and would not be disclosed or divulged to the Special Grand Jury or to the petitioner and his staff.
The commission took about a year to complete its task and then issued a lengthy, detailed report which was made available to the public. After the commission’s final report had been made public in September of 1972, and it appeared therefrom that the commission had received information concerning certain specific criminal acts, the petitioner, on behalf of the Special Grand Jury, served a subpoena duces tecum upon the commission which would require the commission to turn over to the Grand Jury all of its records and files. The petitioner explains that the reason for so doing is that it is his duty to present to, and the duty of the Grand Jury to consider, all available evidence, both incriminatory and exculpatory, concerning any and all criminal acts involved in the episode, particularly when such evidence is in the possession of another governmental agency.
The petitioner contends that all such evidence is and must be available to the Grand Jury under the provisions of section 6 of article I of the New York State Constitution, even though such evidence is in the possession of the Governor, who asserts executive privilege, or of a commission appointed by the Governor, and even though such evidence may have been obtained by the commission under the promise of confidentiality.
The commission has urged several grounds as a basis for quashing the subpoena, including executive privilege, and the so-called public interest privilege.
This court has come to the conclusion that the public interest privilege is applicable to the instant situation and is dispositive of the whole matter, so that it is unnecessary in this decision to discuss all of the other grounds, arguments and contentions urged *600 by the petitioner, the commission, and those appearing amici curiae and for the intervenors.
In People v. Keating (286 App. Div. 150, 152-153 [1st Dept., 1965]), the nature of the public interest privilege was described by Justice Bbeitel as follows: “ In addition to the statutory, there is quite another kind of privilege recognized in the courts. This privilege attaches to confidential communications between public officers, and to public officers, in the performance of their duties, where the public interest requires that such confidential communications or the sources should not be divulged. (Matter of Egan, 205 N. Y. 147, 157; Lewis v. Roux Trucking Corp., 222 App. Div. 204; People ex rel. Heller v. Heller, 184 Misc. 75; 70 C. J., Witneses, §§ 616-617; 8 Wigmore on Evidence [3d ed.], § 2367 et seq.) The invocation of this rule of nondisclosure requires that (1) the person in whom the confidence is placed be a public official; (2) that he be acting in the performance of his duties; and (3) the communication be in the public interest. * * * But, it is stated by Wigmore: ‘ Even where the privilege is strictly applicable, the trial Court may compel disclosure, if it appears necessary in order to avoid the risk of false testimony or to secure useful testimony. ’ (8 Wigmore on Evidence [3d ed.], p. 756.) ” (Emphasis supplied in original.)
In Matter of Langert v. Tenney (5 A D 2d 586 [1st Dept., 1958], mot. for.lv. to app. to Court of Appeals den. 6 A D 2d 777, app. dsmd. 5 N Y 2d 875, in writing for a unanimous court, Justice Bbeitel wrote as follows (pp. 588, 589):
“The highly confidential and investigative function performed by the Commissioner of Investigation of the City of New York has been clearly determined by the Court of Appeals (Matter of Cherkis v. Impellitteri, 307 N. Y. 132). The very purpose of that office would be defeated if communications made to the commissioner were subject to revelation at the suit of the affected individual. In this respect the commissioner’s function is closely allied to that of the District Attorney or the police officer (Lewis v. Roux Trucking Corp., 222 App. Div. 204; People ex rel. Woodill v. Fosdick, 141 App, Div. 450, 452-453; cf. Nields v. Lea, 274 App. Div. 890). Generally, the information received or the records made thereof by public investigating officials is not subject to disclosure or inspection, but there are exceptions. (People v. Walsh, 262 N. Y. 140, 149, supra-, People ex rel. Lemon v. Supreme Court, 245 N. Y. 24; 8 Wigmore on Evidence [3d ed.], § 2374.)
P ‘ ‘ Thus, for instance, upon a criminal trial the court has power \to compel disclosure of matter admissible in evidence, relevant *601 to the innocence of the defendant, and not countervailed by a / superior public interest (People v. Walsh, supra; People ex rel. Lemon v. Supreme Court, supra; Roviaro v. United States, 353 U. S. 53, 59-62). * *
“ Authorities aside, the controlling public interest with regard to the Commissioner of Investigation is that persons be free to lay accusations and information before him without fear that the commissioner may be compelled to make disclosure. It is just about universally true that an investigator is able to encourage such free communication only if he can give assurance that the communication and the identity of its maker will be kept confidential. That public policy is not to be denied except in extraordinary circumstances, such as in the criminal case where the disclosure may be relevant of proof of innocence. ’ ’
If we substitute for the phrase “ Commissioner of Investigation of the City of New York ” the phrase “ the New York State Special Commission on Attica”, it becomes apparent how applicable all this language in these two cases is to the present situation. It seems to be almost beyond question that -if the commission in this case had not been able to assure its informants that their identities and information would be held confidential, the commission could not have performed its important task which was so much in the public interest.
"The court recognizes that there are two competing public interests. On the one hand there is the public interest in the Grand Jury’s exercise of its constitutional power to obtain all relevant evidence for the purpose of holding those responsible for their criminal acts and, on the other hand, there is the public interest in the performance of the duties of the McKay Commission to find out the circumstances which brought about the tragedy at the Attica Correctional Facility regardless of the criminal responsibility.
The object of the commission was to establish the facts, not to indict or punish. (Matter of Di Brizzi, 303 N. Y. 206.) In order to function it was necessary for the commission to promise confidentiality. The McKay Commission’s need for secrecy is a real one and is entitled to consideration. The ultimate decision as to disclosure lies with the courts, but great, if not conclusive weight, should be given to the claim of privilege ' when the circumstances are such that the harm which would result from an unwarranted disclosure is apparent. (United States v. Reynolds, 345 U. S. 1 [1953]; Hartranft’s Appeal, 85 Pa. 433 [1878]; Harding v. Pinchot, 306 Pa. 139, [Super. Ct. of Pa., 1932].)
*602 In this case, to require disclosure would violate the integrity of the commission’s promise of confidentiality to thousands of. witnesses and it would make it difficult, if not impossible, for the Executive Department to ever again conduct a confidential investigation into any matter in which there might be criminal aspects where a Grand Jury is conducting an investigation. Future facts may 'develop in which the guilt or innocence of a defendant may tip the scales in favor of disclosure of individual statements of witnesses before the McKay Commission.
Accordingly, the motion of the respondents to quash the subpoena duces tecum is granted, the court having found that the public interest requires that the files and records of the commission should not be turned over to the Grand Jury. However,. the Grand Jury, by the use of its own powers, is not prevented from obtaining the same information from the same witnesses, that appeared before the commission. In the event that a witness on the trial of an indictment had made a prior statement, to the McKay Commission, it will be for the trial court to determine whether or not such statement should be made available at the trial.
The motion of the petitioner for an order to enjoin the respondents from destroying or otherwise disposing of their files and records is hereby granted.
All other motions are denied.