# BEILAN *v.* BOARD OF PUBLIC EDUCATION, SCHOOL DISTRICT OF PHILADELPHIA.

No. 63.   Argued March 4, 1958.—Decided June 30, 1958.

*John Rogers Carroll* argued the cause for petitioner. With him on the brief was *A. Harry Levitan.*

*C. Brewster Rhoads* argued the cause for respondent. With him on the brief was *Edward B. Soken.*

MR. JUSTICE BURTON delivered the opinion of the Court.

The question before us is whether the Board of Public Education for the School District of Philadelphia, Pennsylvania, violated the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States when the Board, purporting to act under the Pennsylvania Public School Code, discharged a public school teacher on the ground of "incompetency," evidenced by the teacher's refusal of his Superintendent's request to confirm or refute information as to the teacher's loyalty and his activities in certain allegedly subversive organizations. For the reasons hereafter stated, we hold that it did not.

On June 25, 1952, Herman A. Beilan, the petitioner, who had been a teacher for about 22 years in the Philadelphia Public School System, presented himself at his Superintendent's office in response to the latter's request. The Superintendent said he had information which

reflected adversely on petitioner's loyalty and he wanted to determine its truth or falsity. In response to petitioner's suggestion that the Superintendent do the questioning, the latter said he would ask one question and petitioner could then determine whether he would answer it and others of that type. The Superintendent, accordingly, asked petitioner whether or not he had been the Press Director of the Professional Section of the Communist Political Association in 1944.[1] Petitioner asked permission to consult counsel before answering and the Superintendent granted his request.

On October 14, 1952, in response to a similar request, petitioner again presented himself at the Superintendent's office. Petitioner stated that he had consulted counsel and that he declined to answer the question as to his activities in 1944. He announced he would also decline to answer any other "questions similar to it," "questions of this type," or "questions about political and religious beliefs . . . ." The Superintendent warned petitioner that this "was a very serious and a very important matter and that failure to answer the questions might lead to his dismissal." The Superintendent made it clear that he was investigating "a real question of fitness for ￬[petitioner] to be a teacher or to continue in the teaching work." These interviews were given no publicity and were attended only by petitioner, his Superintendent and the Assistant Solicitor of the Board.

On November 25, 1953, the Board instituted dismissal proceedings against petitioner under § 1127 of the Pennsylvania Public School Code of 1949.[2] The only specifi-

---

[1] The Communist Political Association was the predecessor organization of the Communist Party of the United States. See *Yates* v. *United States*, 354 U. S. 298, 304, n. 5.

[2] Pa. Laws 1949, No. 14, Purdon's Pa. Stat. Ann., 1950, Tit. 24, § 11–1127.

cation which we need consider [3] charged that petitioner's refusal to answer his Superintendent's questions constituted "incompetency" under § 1122 of that Code.[4] The Board conducted a formal hearing on the charge. Petitioner was present with counsel but did not testify.

[3] Petitioner's refusal to answer his Superintendent was also charged as persistent and willful violation of the school laws, another statutory ground for dismissal. See note 4, *infra*.

On November 18, 1953, petitioner had been called to testify as a witness in a Philadelphia hearing of a Subcommittee of the United States House Committee on Un-American Activities. There he was asked to confirm or refute several reports as to his alleged subversive activities in 1949 and earlier years. He declined to answer, relying upon the Fifth Amendment to the Federal Constitution. That invocation of the Fifth Amendment was specified by the Board as a further ground of "incompetency." All charges were sustained on the administrative level.

The Pennsylvania Supreme Court found that petitioner's refusal to answer his Superintendent evidenced a statutory "incompetency" sufficient to support his dismissal and, therefore, found it unnecessary to pass on the other grounds for dismissal. 386 Pa. 82, 94, 125 A. 2d 327, 333. It is suggested that petitioner has a right to the initial judgment of the administrative authorities on whether refusal to answer the Superintendent, independent of the other charges, would support the dismissal. Under the Pennsylvania Public School Code, Common Pleas Courts exercise *de novo* review of dismissals. Purdon's Pa. Stat. Ann., 1950 (Cum. Ann. Pocket Pt., 1957), Tit. 24, § 11–1132 (b). A dismissal can be sustained if the court finds support for any one of the multiple grounds relied upon by the dismissing school board. Cf. *Brown Case*, 347 Pa. 418, affirming 151 Pa. Super. 522, 30 A. 2d 726, reported *sub nom. Appeal of School District of City of Bethlehem*, 32 A. 2d 565. This allocation of functions between the Pennsylvania courts and administrative agencies does not violate due process. Accordingly, it is necessary for us to consider only the one ground relied upon by the Pennsylvania Supreme Court. As a matter of jurisdiction, our only jurisdiction is over the Pennsylvania Supreme Court, as the highest court of the State.

[4] Section 1122 of that Code, in 1952 and 1953, provided that "The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be immorality,

Counsel for each side agreed that petitioner's loyalty was not in issue, and that evidence as to his disloyalty would be irrelevant.[5] On January 7, 1954, the Board found that the charge of incompetency had been sustained and, by a vote of fourteen to one, discharged petitioner from his employment as a teacher.

*incompetency,* intemperance, cruelty, persistent negligence, mental derangement, persistent and wilful violation of the school laws of this Commonwealth on the part of the professional employe." (Emphasis supplied.) Pa. Laws 1949, No. 14, as amended, Pa. Laws 1951, No. 463, § 16; Purdon's Pa. Stat. Ann., 1950 (Cum. Ann. Pocket Pt., 1957), Tit. 24, § 11-1122.

As enacted in 1949, § 1122 had contained, after the words "mental derangement," the clause, "advocation of or participating in un-American or subversive doctrines." Pa. Laws 1949, No. 14. That clause, however, was deleted by § 16 of the Pennsylvania Loyalty Act, approved December 22, 1951, effective March 1, 1952. Pa. Laws 1951, No. 463.

[5] Counsel for the Board, at the outset of the hearing, stated:
"It is my contention, and it has been the thought of your counsel since these proceedings were initiated, that these are not proceedings brought against these respondents charging them with disloyalty. If that were the situation we would have a completely different record, a completely different set of facts, a completely different section under which the charges would be made, if made at all.

.          .          .          .          .

"Now, so far as I am concerned, sir, and so far as my presentation of testimony is concerned, I don't think whether this man is loyal or disloyal has anything to do with this case. And if your counsel's advice were being asked in the matter, I should say that any testimony directed toward present loyalty or disloyalty is completely out of this case.

.          .          .          .          .

"So far as this case is concerned, we are not delving into present or past loyalty."

Counsel for petitioner stated: "Mr. President, if you please, I have no intention of seeing this proceeding become a loyalty hearing. Mr. Rhoads [counsel for the Board] has stated that it is not. I agree with him completely."

On an administrative appeal, the Superintendent of Public Instruction of Pennsylvania sustained the local Board. However, on petitioner's appeal to the County Court of Common Pleas, that court set aside petitioner's discharge and held that the Board should have followed the procedure specified by the Pennsylvania Loyalty Act, rather than the Public School Code. Finally, on the Board's appeal, the Supreme Court of Pennsylvania, with two justices dissenting, reversed the Court of Common Pleas and reinstated petitioner's discharge. 386 Pa. 82, 98, 110, 125 A. 2d 327, 334, 340. We granted certiorari. 353 U. S. 964.

In addition to the Public School Code, Pennsylvania has a comprehensive Loyalty Act which provides for the discharge of public employees on grounds of disloyalty or subversive conduct. Purdon's Pa. Stat. Ann., 1941 (Cum. Ann. Pocket Pt., 1957), Tit. 65, §§ 211–225. Petitioner stresses the fact that the question asked of him by his Superintendent related to his loyalty. He contends that he was discharged for suspected disloyalty and that his discharge is invalid because of failure to follow the Loyalty Act procedure. However, the Pennsylvania Supreme Court held that the Board was not limited to proceeding under the Loyalty Act, even though the questions asked of petitioner related to his loyalty. We are bound by the interpretation thus given to the Pennsylvania statutes by the Supreme Court of Pennsylvania. *Barsky* v. *Board of Regents,* 347 U. S. 442, 448; *Chicago, M., St. P. & P. R. Co.* v. *Risty,* 276 U. S. 567, 570. The only question before us is whether the Federal Constitution prohibits petitioner's discharge for statutory "incompetency" based on his refusal to answer the Superintendent's questions.[6]

---

[6] There is no showing that the statute was discriminatorily applied. Cf. *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Lane* v. *Wilson,* 307 U. S. 268.

By engaging in teaching in the public schools, petitioner did not give up his right to freedom of belief, speech or association. He did, however, undertake obligations of frankness, candor and cooperation in answering inquiries made of him by his employing Board examining into his fitness to serve it as a public school teacher.

"A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted." *Adler* v. *Board of Education,* 342 U. S. 485, 493.

As this Court stated in *Garner* v. *Board of Public Works,* 341 U. S. 716, 720, "We think that a municipal employer is not disabled because it is an agency of the State from inquiring of its employees as to matters that may prove relevant to their fitness and suitability for the public service."

The question asked of petitioner by his Superintendent was relevant to the issue of petitioner's fitness and suitability to serve as a teacher. Petitioner is not in a position to challenge his dismissal merely because of the remoteness in time of the 1944 activities. It was apparent from the circumstances of the two interviews that the Superintendent had other questions to ask. Petitioner's refusal to answer was not based on the remoteness of his 1944 activities. He made it clear that he would not answer any question of the same type as the one asked. Petitioner blocked from the beginning any inquiry into his Communist activities, however relevant to his present loyalty. The Board based its dismissal upon petitioner's

refusal to answer any inquiry about his relevant activities—not upon those activities themselves. It took care to charge petitioner with incompetency, and not with disloyalty. It found him insubordinate and lacking in frankness and candor—it made no finding as to his loyalty.

We find no requirement in the Federal Constitution that a teacher's classroom conduct be the sole basis for determining his fitness. Fitness for teaching depends on a broad range of factors. The Pennsylvania tenure provision [7] specifies several disqualifying grounds, including immorality, intemperance, cruelty, mental derangement and persistent and willful violation of the school laws, as well as "incompetency." However, the Pennsylvania statute, unlike those of many other States, contains no catch-all phrase, such as "conduct unbecoming a teacher," [8] to cover disqualifying conduct not included within the more specific provisions. Consequently, the Pennsylvania courts have given "incompetency" a broad interpretation. This was made clear in *Horosko* v. *Mt. Pleasant School District,* 335 Pa. 369, 371, 374–375, 6 A. 2d 866, 868, 869–870:

> "If the fact be that she 'now commands neither the respect nor the good will of the community' and if the record shows that effect to be the result of her

[7] See note 4, *supra.*

[8] *E. g.,* Baldwin's Ky. Rev. Stat. Ann., 1955, § 161.790 (1), "conduct unbecoming a teacher," "during good behavior."

Mass. Ann. Laws, 1953 (Cum. Supp., 1957), c. 71, § 42, "conduct unbecoming a teacher," "or other good cause."

West's Ann. Cal. Code, Education, § 13521 (a), (e), "unprofessional conduct," "Evident unfitness for service."

Smith-Hurd's Ill. Ann. Stat., 1946 (Cum. Ann. Pocket Pt., 1957), c. 122, § 6–36, "other sufficient cause."

Burns' Ann. Ind. Stat., 1948 Replacement Vol., § 28–4308, "other good and just cause."

conduct within the clause quoted, it will be conclusive evidence of incompetency. It has always been the recognized duty of the teacher to conduct himself in such way as to command the respect and good will of the community, though one result of the choice of a teacher's vocation may be to deprive him of the same freedom of action enjoyed by persons in other vocations. Educators have always regarded the example set by the teacher as of great importance . . . .

.        .        .        .        .

"The term 'incompetency' has a 'common and approved usage'. The context does not limit the meaning of the word to lack of substantive knowledge of the subjects to be taught. Common and approved usage give a much wider meaning. For example, in 31 C. J., with reference to a number of supporting decisions, it is defined: 'A relative term without technical meaning. It may be employed as meaning disqualification; inability; incapacity; lack of ability, legal qualifications, or fitness to discharge the required duty.' In Black's Law Dictionary (3rd edition) page 945, and in Bouvier's Law Dictionary, (3rd revision) p. 1528, it is defined as 'Lack of ability or fitness to discharge the required duty.' Cases construing the word to the same effect are found in Words and Phrases, 1st series, page 3510, and 2nd series, page 1013. Webster's New International Dictionary defines it as 'want of physical, intellectual, or moral ability; insufficiency; inadequacy; specif., want of legal qualifications or fitness.' Funk & Wagnalls Standard Dictionary defines it as 'General lack of capacity of fitness, or lack of the special qualities required for a particular purpose.' "

In the *Horosko* case, a teacher was discharged for "incompetency" because of her afterhours activity in her husband's beer garden, serving as a bartender and waitress, occasionally drinking beer, shaking dice with the customers for drinks and playing the pinball machine. Cf. *Schwer's Appeal,* 36 Pa. D. & C. 531, 536.

In the instant case, the Pennsylvania Supreme Court has held that "incompetency" includes petitioner's "deliberate and insubordinate refusal to answer the questions of his administrative superior in a vitally important matter pertaining to his fitness." 386 Pa., at 91, 125 A. 2d, at 331. This interpretation is not inconsistent with the Federal Constitution.

Petitioner complains that he was denied due process because he was not sufficiently warned of the consequences of his refusal to answer his Superintendent. The record, however, shows that the Superintendent, in his second interview, specifically warned petitioner that his refusal to answer "was a very serious and a very important matter and that failure to answer the questions might lead to his dismissal." That was sufficient warning to petitioner that his refusal to answer might jeopardize his employment. Furthermore, at petitioner's request, his Superintendent gave him ample opportunity to consult counsel. There was no element of surprise.

Our recent decisions in *Slochower* v. *Board of Education,* 350 U. S. 551, and *Konigsberg* v. *State Bar of California,* 353 U. S. 252, are distinguishable. In each we envisioned and distinguished the situation now before us. In the *Slochower* case, at 558, the Court said:

> "It is one thing for the city authorities themselves to inquire into Slochower's fitness, but quite another for his discharge to be based entirely on events occurring before a federal committee whose inquiry was announced as not directed at 'the property, affairs,

or government of the city, or . . . official conduct of city employees.' In this respect the present case differs materially from *Garner* [341 U. S. 716], where the city was attempting to elicit information necessary to determine the qualifications of its employees. Here, the Board had possessed the pertinent information for 12 years, and the questions which Professor Slochower refused to answer were admittedly asked for a purpose wholly unrelated to his college functions. On such a record the Board cannot claim that its action was part of a bona fide attempt to gain needed and relevant information."

In the *Konigsberg* case, *supra,* at 259–261, this Court stressed the fact that the action of the State was not based on the mere refusal to answer relevant questions— rather, it was based on inferences impermissibly drawn from the refusal. In the instant case, no inferences at all were drawn from petitioner's refusal to answer. The Pennsylvania Supreme Court merely equated refusal to answer the employing Board's relevant questions with statutory "incompetency."

Inasmuch as petitioner's dismissal did not violate the Federal Constitution, the judgment of the Supreme Court of Pennsylvania is

*Affirmed.*

MR. JUSTICE FRANKFURTER, concurring.*

Although I join the opinion of the Court in both these cases, a word of emphasis is appropriate against finding that New York and Pennsylvania—for the highest courts of those States are for our purposes the States—have violated the United States Constitution by attributing to them determinations that they have not made and have

*[NOTE: This opinion applies also to No. 165, *Lerner* v. *Casey, post,* p. 468.]

carefully avoided making. Such a finding would rest, as I understand it, on the theory that although the States, with a due sense of responsibility, have not made these determinations, they may be attributed to them because persons who do not make distinctions that are important in law and the conduct of government may loosely infer them.

The services of two public employees have been terminated because of their refusals to answer questions relevant, or not obviously irrelevant, to an inquiry by their supervisors into their dependability. When these two employees were discharged, they were not labeled "disloyal." They were discharged because governmental authorities, like other employers, sought to satisfy themselves of the dependability of employees in relation to their duties. Accordingly, they made inquiries that, it is not contradicted, could in and of themselves be made. These inquiries were balked. The services of the employees were therefore terminated.

Because the specific questions put to these employees were part of a general inquiry relating to what is compendiously called subversion and to conduct that on due proof may amount to disloyalty, every part of the process of inquiry is given the attribute of an inquiry into disloyalty and every resulting severance from service is deemed a finding of disloyalty. The argument runs, in essence, that because such an inquiry may in certain instances lead to a determination of disloyalty, the refusal to answer any questions in this process and dismissal therefor themselves establish disloyalty. To make such an attribution to a State, to draw such an inference from a carefully limited exercise of state power, to disallow state action because there are those who may draw inferences that the State itself has not drawn and has avoided drawing, is a curbing of the States through the Fourteenth Amendment that makes of that Amendment an instru-

ment of general censorship by this Court of state action. In refusing to put the Fourteenth Amendment to such a use, I am of course wholly unconcerned with what I may think of the wisdom or folly of the state authorities. I am not charged with administering the transportation system of New York or the school system of Pennsylvania. The Fourteenth Amendment does not check foolishness or unwisdom in such administration. The good sense and right standards of public administration in those States must be relied upon for that, and ultimately the electorate.

MR. CHIEF JUSTICE WARREN, dissenting.*

I believe the facts of record in No. 63 compel the conclusion that Beilan's plea of the Fifth Amendment before a subcommittee of the House Committee on Un-American Activities was so inextricably involved in the Board's decision to discharge him that the validity of the Board's action cannot be sustained without consideration of this ground. The clearest indication of this is the fact that for 13 months following petitioner's refusal to answer the Superintendent's questions, he was retained as a school teacher and continually rated "satisfactory," yet five days after his appearance before the House subcommittee petitioner was suspended. Since a plea of the Fifth Amendment before a congressional committee is an invalid basis for discharge from public employment, *Slochower* v. *Board of Higher Education,* 350 U. S. 551, I would reverse the judgment approving petitioner's dismissal.

I cannot agree that the invalidity of the Board's action is cured by the Pennsylvania Supreme Court's conclusion that the dismissal was "justified" if any charge against petitioner was sustained. Whether the first refusal alone

---

*[NOTE: This opinion applies also to No. 165, *Lerner* v. *Casey, post,* p. 468.]

would "justify" the discharge we need not decide. This Court has previously held that where a conclusion of guilt may rest on a constitutionally impermissible basis, the adjudication must be set aside, notwithstanding a state court's conclusion that permissible bases existed on which the decision might have rested. *Stromberg* v. *California,* 283 U. S. 359, 368; see also *Williams* v. *North Carolina,* 317 U. S. 287, 292. There may be exceptions to the application of this principle to the full range of state administrative action. Nevertheless, on the particular facts of this case, the invalid basis of the State's action is too critical to be ignored.

For these reasons MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS and I dissent in No. 63. I also dissent in No. 165 for the reasons stated in the dissenting opinion of MR. JUSTICE BRENNAN.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.*

The holding of the Court that the teacher in the *Beilan* case and the subway conductor in the *Lerner* case could be discharged from their respective jobs because they stood silent when asked about their Communist affiliations cannot, with due deference, be squared with our constitutional principles.

Among the liberties of the citizens that are guaranteed by the Fourteenth Amendment are those contained in the First Amendment. *Stromberg* v. *California,* 283 U. S. 359; *De Jonge* v. *Oregon,* 299 U. S. 353; *Murdock* v. *Pennsylvania,* 319 U. S. 105; *Everson* v. *Board of Education,* 330 U. S. 1; *Staub* v. *City of Baxley,* 355 U. S. 313, 321. These include the right to believe what one chooses, the right to differ from his neighbor, the right to pick and

---

*[NOTE: This opinion applies also to No. 165, *Lerner* v. *Casey, post,* p. 468.]

choose the political philosophy that he likes best, the right to associate with whomever he chooses, the right to join the groups he prefers, the privilege of selecting his own path to salvation. The Court put the matter succinctly in *Board of Education* v. *Barnette*, 319 U. S. 624, 641–642:

> "We can have intellectual individualism and the rich cultural diversities that we owe to exceptional minds only at the price of occasional eccentricity and abnormal attitudes. When they are so harmless to others or to the State as those we deal with here, the price is not too great. But freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order.
>
> "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."

We deal here only with a matter of belief. We have no evidence in either case that the employee in question ever committed a crime, ever moved in treasonable opposition against this country. The only mark against them—if it can be called such—is a refusal to answer questions concerning Communist Party membership. This is said to give rise to doubts concerning the competence of the teacher in the *Beilan* case and doubts as to the trustworthiness and reliability of the subway conductor in the *Lerner* case.

Our legal system is premised on the theory that every person is innocent until he is proved guilty. In this country we have, however, been moving away from that concept. We have been generating the belief that

anyone who remains silent when interrogated about his unpopular beliefs or affiliations is guilty. I would allow no inference of wrongdoing to flow from the invocation of any constitutional right. I would not let that principle bow to popular passions. For all we know we are dealing here with citizens who are wholly innocent of any wrongful action. That must indeed be our premise. When we make the contrary assumption, we part radically with our tradition.

If it be said that we deal not with guilt or innocence but with frankness, the answer is the same. There are areas where government may not probe. Private citizens, private clubs, private groups may make such deductions and reach such conclusions as they choose from the failure of a citizen to disclose his beliefs, his philosophy, his associates. But government has no business penalizing a citizen merely for his beliefs or associations. It is government action that we have here. It is government action that the Fourteenth and First Amendments protect against. We emphasized in *N. A. A. C. P.* v. *Alabama,* decided this day, *post,* p. 449, that freedom to associate is one of those liberties protected against governmental action and that freedom from "compelled disclosure of affiliation with groups engaged in advocacy" is vital to that constitutional right. We gave protection in the *N. A. A. C. P.* case against governmental probing into political activities and associations of one dissident group of people. We should do the same here.

If we break with tradition and let the government penalize these citizens for their beliefs and associations, the most we can assume from their failure to answer is that they were Communists. Yet, as we said in *Wieman* v. *Updegraff,* 344 U. S. 183, 190, membership in the Communist Party "may be innocent." The member may have thought that the Communist movement would develop in the parliamentary tradition here, or he may not have

been aware of any unlawful aim, or knowing it, may have embraced only the socialist philosophy of the group, not any political tactics of violence and terror. Many join associations, societies, and fraternities with less than full endorsement of all their aims.

We compound error in these decisions. We not only impute wrongdoing to those who invoke their constitutional rights. We go further and impute the worst possible motives to them.

As Judge Fuld said in dissent in the *Lerner* case, "It is a delusion to think that the nation's security is advanced by the sacrifice of the individual's basic liberties. The fears and doubts of the moment may loom large, but we lose more than we gain if we counter with a resort to alien procedures or with a denial of essential constitutional guarantees." 2 N. Y. 2d 355, 378, 141 N. E. 2d 533, 546.

Our initial error in all this business (see *Dennis* v. *United States,* 341 U. S. 494) was our disregard of the basic principle that government can concern itself only with the actions of men, not with their opinions or beliefs. As Thomas Jefferson said in 1779:

> ". . . the opinions of men are not the object of civil government, nor under its jurisdiction; . . . it is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into overt acts against peace and good order." [1]

The fitness of a subway conductor for his job depends on his health, his promptness, his record for reliability, not on his politics or philosophy of life. The fitness of a teacher for her job turns on her devotion to that priesthood, her education, and her performance in the library, in the laboratory, and the classroom, not on her political beliefs. Anyone who plots against the government and

---

[1] 2 Papers of Thomas Jefferson (Boyd ed. 1950) 546.

moves in treasonable opposition to it can be punished. Government rightly can concern itself with the actions of people. But it's time we called a halt to government's penalizing people for their beliefs. To repeat, individuals and private groups can make any judgments they want. But the realm of belief—as opposed to action—is one which the First Amendment places beyond the long arm of government.

A teacher who is organizing a Communist cell in a schoolhouse or a subway conductor who is preparing the transportation system for sabotage would plainly be unfit for his job. But we have no such evidence in the records before us. As my Brother BRENNAN points out, to jump to those conclusions on these records is to short-cut procedural due process.

In sum, we have here only a bare refusal to testify; and the Court holds that sufficient to show that these employees are unfit to hold their public posts. That makes qualification for public office turn solely on a matter of belief—a notion very much at war with the Bill of Rights.

When we make the belief of the citizen the basis of government action, we move toward the concept of *total security*. Yet *total security* is possible only in a totalitarian regime [2]—the kind of system we profess to combat.

---

[2] In an analogous situation, Judge Pope stated the problem for the Court of Appeals in *Parker* v. *Lester*, 227 F. 2d 708, 721:
"It cannot be said that in view of the large problem of protecting the national security against sabotage and other acts of subversion we can sacrifice and disregard the individual interest of these merchant seamen because they are comparatively few in number. It is not a simple case of sacrificing the interests of a few to the welfare of the many. In weighing the considerations of which we are mindful here, we must recognize that if these regulations may be sustained, similar regulations may be made effective in respect to other groups as to whom Congress may next choose to express its legislative fears. No doubt merchant seamen are in a sensitive position in that the opportunities for serious sabotage are numerous. If it can be said

MR. JUSTICE BRENNAN, dissenting.*

It is instructive on occasion to ask why particular cases are brought before this Court for review. The Court has said again and again that the incorrectness of a decision of a court below—and especially of a state court—is not sufficient reason for us to exercise our discretionary power to bring the case here. There must be "special and important reasons therefor." Rule 19 (1) of this Court. We must, therefore, ask ourselves the question: What special character and importance of the right asserted justified our taking these cases for review?

The Court treats the cases as though the only right involved were the right of an unreliable subway conductor

---

that a merchant seaman notwithstanding his being on board might sink the ship loaded with munitions for Korea, it is plain that many persons other than seamen would be just as susceptible to security doubts. The enginemen and trainmen hauling the cargo to the docks, railroad track and bridge inspectors, switchmen and dispatchers, have a multitude of opportunities for destruction. Dangerous persons might infiltrate the shipping rooms of factories where the munitions are being packed for shipment to Korea with opportunities for inserting bombs appropriately timed for explosion on board ship. All persons who are in factories making munitions and material for the armed forces have opportunities for sabotage, and the same may be said of all operators of transportation facilities, not to mention workers upon the docks.

.          .          .          .          .

"It may be possible that we have reached an age when our system of constitutional freedom and individual rights cannot hold its own against those who, under totalitarian discipline are prepared to infiltrate not only our public services, but our civilian employments as well. In the event of war we may have to anticipate Black Tom explosions on every waterfront, poison in our water systems, and sand in all important industrial machines. But the time has not come when we have to abandon a system of liberty for one modeled on that of the Communists. Such a system was not that ordained by the framers of our Constitution. It is the latter we are sworn to uphold."

*[NOTE: This dissenting opinion of MR. JUSTICE BRENNAN applies also to No. 165, *Lerner* v. *Casey*, *post*, p. 468.]

and an incompetent schoolteacher to hold their jobs. But if that were really all that was involved in these cases, I fail to see why it should take some nine pages in each case to justify the State's action. I can scarcely believe that such concern would be displayed if the question were whether there was evidence to show that Lerner was unreliable about getting the subway doors opened promptly at each station, or that Beilan was incompetent as an algebra teacher. It is obvious that more is at stake here than the loss of positions of public employment for unreliability or incompetence. Rather, it is the simultaneous public labeling of the employees as disloyal that gives rise to our concern.

New York and Pennsylvania have publicly announced that the subway conductor and teacher are disloyal Americans. This consequence of the States' actions is devastating beside the loss of employment. In each case a man's honor and reputation are indelibly stained. "There can be no dispute about the consequences visited upon a person excluded from public employment on disloyalty grounds. In the view of the community, the stain is a deep one; indeed, it has become a badge of infamy." *Wieman* v. *Updegraff*, 344 U. S. 183, 190–191. The petitioners thus not only lose their present jobs, but their standing in the community is so undermined as doubtless to cost them most opportunities for future jobs.

Moreover, the States' actions touch upon important political rights which have ever warranted the special attention of the courts. It may be stated as a generality that government is never at liberty to be arbitrary in its relations with its citizens, and close judicial scrutiny is essential when state action infringes on the right of a man to be accepted in his community, to express his ideas in an atmosphere of calm decency, and to be free of the dark stain of suspicion and distrust of his loyalty on account of his political beliefs and associations.

*N. A. A. C. P.* v. *Alabama, post,* p. 449, decided this day. It is these rights which stand before the bar today, and it is in the awareness of their implications that these cases must be decided.

The people of New York and Pennsylvania have voiced through their legislatures their determination that the stain of disloyalty shall not be impressed upon a state employee without fair procedures in which the State carries the burden of proving specific charges by a fair preponderance of evidence. Cf. *Adler* v. *Board of Education,* 342 U. S. 485. In the New York Security Risk Law and the Pennsylvania Loyalty Act the States have endeavored to provide the traditional Anglo-American standards of procedural due process for the ascertainment of guilt. Yet this Court today finds no denial of due process in the palpable evasion of these standards of fair play by administrative officials. This Court refuses to pierce the transparent denials that each of these employees was publicly branded disloyal. The Court holds that we are bound by the definition of state law pronounced by the States' high courts that the dismissals were for unreliability and incompetency. Of course, we accept state law as the high court of a State pronounces it, but certainly our duty to secure to the individual the safeguards, embodied in due process, against a State's arbitrary exercise of power is no less when the state courts refuse to recognize what has in fact occurred. Cf. *Payne* v. *Arkansas,* 356 U. S. 560; *Moore* v. *Michigan,* 355 U. S. 155. See also *Broad River Power Co.* v. *South Carolina ex rel. Daniel,* 281 U. S. 537, 540. In my view the judgments in both cases must be reversed because each petitioner has been branded a disloyal American without the due process of law required of the States by the Fourteenth Amendment. "Strict adherence to required legal procedures, especially where one's loyalty is being impugned, affords the greatest and, in last analysis,

the ultimate assurance of the inviolability of our freedoms as we have heretofore known them in this Country. Least of all, should they be impaired or trenched upon by procedural shortcuts." *Board of Public Education* v. *Beilan,* 386 Pa. 82, 99, 125 A. 2d 327, 335 (Jones, J., dissenting).

## LERNER *v.* CASEY.

In response to the outbreak of hostilities in Korea in 1950 the New York Legislature, early in its next session, enacted its Security Risk Law, Laws 1951, c. 233. Section 1 of the Act is a declaration of legislative finding that the Korean hostilities had brought about the existence "of a serious public emergency in this state" and that "the employment of members of subversive groups and organizations by government presents a grave peril to the national security." Section 5 of the Act provides that the appointing officer may transfer or suspend a person occupying a position within a "security agency" of the State after a finding based "upon all the evidence" that, "because of doubtful trust and reliability, the employment of such person in such position would endanger the security or defense of the nation and the state." Pursuant to § 3 of the Act the State Civil Service Commission determined in 1953 that the New York Transit Authority is a "security agency" for purposes of the Act. In 1954, appellant Lerner, a subway conductor, was directed to appear before the Department of Investigation of the City of New York. On this and a subsequent appearance he refused to answer the question whether he was then a member of the Communist Party on the grounds that his answer might tend to incriminate him.

When this information was brought to the attention of the Transit Authority they sent a notice to appellant advising him that he was suspended under § 5 of the Security Risk Law because "reasonable grounds exist for

belief that, because of doubtful trust and reliability, your employment in the position of Conductor will endanger the security or defense of the nation and state." The Transit Authority specified the grounds for this belief: "[Y]ou refused to answer questions as to whether you were then a member of the Communist Party and invoked the Fifth Amendment to the Constitution of the United States." Appellant brought this action in the New York state courts alleging, *inter alia,* that the finding that he was a security risk within the meaning of the New York statute is wholly without evidence and therefore violative of the Due Process Clause of the Fourteenth Amendment. The New York courts dismissed this contention by the following reasoning: (1) appellant's refusal to answer whether he was then a member of the Communist Party proves a lack of candor; (2) the lack of candor proves that he was of doubtful trust and reliability; and (3) doubtful trust and reliability proves further that appellant was a security risk within the meaning of the Act. This Court, without discussion, follows this chain of reasoning. But careful analysis, I believe, shows that it is fallacious and leads to an arbitrary result.

The proper consideration of this case requires, I repeat, that the true issue be stated with clarity. We are concerned with far more than, in the Court's phrase, "the validity of appellant's dismissal from his position as a subway conductor in the New York City Transit System." The issue is, rather, the validity of his dismissal *as a security risk.* The difference is profound, as I have suggested, for the label "security risk" inevitably invites in the public mind the deep suspicion of disloyalty, namely, that he is, in the words of the statute, a threat to "the security or defense of the nation and the state."

Of course, the term "security risk" is not synonymous with "disloyal." In certain positions—such as those involving access to secret information, for instance—an

employee who is an alcoholic or merely too talkative may well be considered a risk to security. But this is not such a case. Lerner handled no secrets. Common sense tells us that if a subway conductor is a security risk at all while at work he is such because he may engage in sabotage. Indeed, the record makes clear that it was just this danger that motivated the New York authorities in extending the Security Risk Law to the Transit System.

The only evidence relied upon to show that Lerner is a disloyal person is his refusal to answer the question whether he was a member of the Communist Party. It might be conceded that the question was relevant to his qualifications for his job and therefore properly asked. But once the propriety of the question was established, the New York Court of Appeals approved treating the nature of the question as though it were irrelevant to the determination of the ultimate fact of disloyalty. And this Court too says that the finding that Lerner is a security risk could be based on a refusal to "give any other information about himself which might be relevant to his employment." But can we suppose that a subway conductor would be branded a security risk if he refused to answer a question about his health? Of course the answer is no, although the question is plainly relevant to his qualifications for employment. It may well be that in such a case the State would be fully justified in discharging the employee as "untrustworthy and unreliable." But one would hardly stretch reason so far as further to label him a "security risk." To do so would be arbitrary in the extreme. It is equally arbitrary here, for New York and this Court expressly disavow the drawing of any inferences from the nature of the question asked or from Lerner's refusal to answer it. Nonetheless, by invoking the formalized procedures of its Security Risk Law, New York has publicly announced that it possesses the evidence required by the terms of that statute to justify the

conclusion that Lerner is in fact a disloyal American. Yet the record is wholly devoid of the essential requisite of evidence to support the ultimate finding of disloyalty. Cf. *Tot* v. *United States*, 319 U. S. 463. In this plainly arbitrary manner, Lerner is gratuitously defamed, his honor and reputation indelibly stained. And the wound is far deeper than the occasion demands, for certainly New York cannot lack procedures under which he could have been discharged without blemishing his name.

## BEILAN v. BOARD OF PUBLIC EDUCATION.

Here also, the Court has not, in my opinion, stated or decided the true issue of due process tendered by this case. I doubt that a meritorious question for our review would be presented if the issue was, as the Court says, the constitutional validity of a dismissal solely for refusal of the teacher to answer the relevant questions asked by the School Superintendent in private interviews. I might agree that the Due Process Clause imposes no restraint against dismissal of a teacher who refuses to answer his superior's questions asked in the privacy of his office and related to the teacher's fitness to continue in his position.

But in reality Beilan was not dismissed by the Pennsylvania school authorities upon that ground. The question whether he had been an officer in the Communist Party in 1944 was first asked of Beilan by the Superintendent at a private interview on June 25, 1952. Beilan did not refuse at that time to answer but asked permission to consult counsel. The Superintendent summoned him again on October 14, 1952, and it was on that date that Beilan advised the Superintendent that he declined to answer that or similar questions. The Superintendent had told Beilan at the first interview that the question was asked because the Superintendent had information which reflected on Beilan's loyalty. Almost fourteen months elapsed before Beilan was suspended and the

charges preferred which led to his dismissal. In that interval Beilan's superiors had twice rated him in the high satisfactory range of competency. Had the authorities seriously regarded Beilan as incompetent because of his refusal to answer the Superintendent's question they would hardly have waited so long before suspending him. The record is clear that proceedings were actually initiated not because of that refusal to answer but because on November 18, 1953, Beilan asserted the privilege against self-incrimination under the Fifth Amendment when interrogated at a publicly televised hearing held in Philadelphia by a Subcommittee of the Committee on Un-American Activities of the House of Representatives. Beilan testified at that hearing that he was not then a member of the Communist Party and had never advocated the overthrow of the Government by force or violence but pleaded the protection of the Fifth Amendment when asked questions directed to past party membership and activities. Five days later, on November 23, 1953, the Superintendent notified Beilan that he had been rated "unsatisfactory" because he had refused to answer the Superintendent's question and also because "[y]ou invoked the Fifth Amendment of the Federal Constitution" when questioned as to "past associations with organizations of doubtful loyalty" by the Subcommittee. The opinion on Beilan's administrative appeal which sustained his dismissal by the Board of Education makes it clear that the authorities viewed Beilan's invocation of the Fifth Amendment before the Subcommittee as an admission of disloyalty. The opinion states: "[B]y all the concepts of logic and reason the teacher admits that he has done something for which he might be prosecuted criminally." It is this administrative record which Beilan must present to his next employer. Cf. *Harmon* v. *Brucker,* 355 U. S. 579.

The Court of Common Pleas found that the administrative proceedings were actually concerned solely with the question of Beilan's suspected disloyalty and reversed upon the ground that "the legislature intended to deal with the matter of loyalty solely by the method of procedure provided in the [Pennsylvania] Loyalty Act."

The Pennsylvania Supreme Court, however, did not pass upon the question of the propriety of the inference of disloyalty drawn by the administrative authorities from Beilan's invocation of the Fifth Amendment before the Subcommittee. That question is, therefore, not before us. The Pennsylvania Supreme Court held that the action of the authorities might be sustained solely because Beilan had refused to answer the Superintendent's question. But this is to sustain a finding of Beilan's disloyalty without competent evidence of the fact. As in *Lerner* the inference of disloyalty is arbitrary in the extreme. Yet Pennsylvania, like New York in the *Lerner* case, publicly announces contrary to the fact that it possesses competent evidence justifying the conclusion that Beilan is in fact a disloyal American. In my view Beilan also is, in that arbitrary manner, denied due process of law in violation of the Fourteenth Amendment.

I would reverse both judgments.