Irene WILLIAMS, Plaintiff,

v.

**SUMTER SCHOOL DISTRICT NUMBER 2, a public body corporate, Dan L. Reynolds, Chairman of the Board of Trustees of Sumter School District Number 2, Sumter, South Carolina, and H. Curtis Edens, Jr., Clarence E. Phillips, Jr., W. Hazel McCoy and Russell F. Jones, Members, Board of Trustees of Sumter School District Number 2, Sumter, South Carolina;**

and

**Hugh T. Stoddard, Superintendent of Sumter School District Number 2, Sumter, South Carolina, Defendants.**

Civ. A. No. AC–1534.

United States District Court
D. South Carolina,
Columbia Division.

June 15, 1966.

Ernest A. Finney, Jr., Sumter, S. C., Donald James Sampson, Greenville, S. C., Lincoln C. Jenkins, Jr., Matthew J. Perry, Columbia, S. C., and Jack Greenberg, New York City, for plaintiff.

Shepard K. Nash, Sumter, S. C., for defendants.

HEMPHILL, District Judge.

Plaintiff, a Negro citizen and school teacher, of Sumter, South Carolina, brings this action complaining that defendants acting under the color of authority [1] invested in them by the laws of South Carolina failed and refused to offer renewal of her contract to teach in the Sumter County Schools for the 1964–65 school year "by reason of the civil rights activities and associations designed to end racial discrimination engaged in by her." Her demand, filed September 15, 1964, among other pray-

1. Title 28 Section 1343(3) United States Code provides: To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

ers for relief, asked that the court "enter a preliminary and permanent injunction requiring the defendants * * * and those acting in concert with them to offer plaintiff a teaching contract * * * and to continue such contractual basis * * * without regard to * * * [her] activities in behalf of civil rights generally and the desegregation of public schools in particular." In reality she seeks mandamus, which, classified as an extraordinary and drastic legal writ,[2] may be issued where the duties sought to be enforced are clear and the sound discretion of the court requires it.

Plaintiff, who had been a teacher in Manchester School for 10 years prior to this action, was recommended for reemployment in the 1964–65 school year by her principal, who described her as "the best teacher we had—understanding, sympathetic, very diligent, very cooperative * * *." Aside from her teaching activity, it is admitted by all parties that she was vigorous in the promotion of civil rights in and about Sumter including but not limited to the following about which defendant Board knew, and which counsel explored during the course of the hearing before this Court:

(a) A leader in the "Sumter Movement" being on the Steering Committee guiding the activities of the movement, having charge of demonstrations and sit-ins.

(b) She was arrested by the police of the City of Sumter.

(c) Knew children between 10 and 16 years were in the parade, and that some of these children had been brought before the Domestic Relations Judge.

(d) Her husband, a teacher in the same School District as plaintiff, was in the parades but is still teaching for defendants at a salary of slightly above seven Thousand ($7000.00) Dollars per annum.

(e) Picketed in front of Singer Sewing Machine, Brodies Department Store, McLellan's Store, and Kress's Store, all on Main Street— wearing signs saying substantially "Hire Negro Clerks, equal opportunity for all" and such like slogans.

(f) Although knowing it was necessary to obtain permission from the Superintendent or Supervising Principal,[3] did not obtain such permission, and absented herself on August 28, 1963, from the first meeting of teachers for 1964–65 school year, for the purpose of marching in the demonstrations in Washington, D. C.

(g) Entered students in a wool contest without permission of school authorities.

(h) Juveniles arrested and taken before the Domestic Relations Court, growing out of demonstrations, sit-ins, etc.—represented a total of 112 cases—not necessarily different children. Twenty one of these children were charged with trespassing, thirteen charged with conducting themselves in a manner dangerous to their welfare, and welfare of those around them.

From defendants' brief we quote: "Defendants, with above admitted facts before them, did not contract with plaintiff to teach for the year 1964–65."

Other related facts reveal that Dr. Hugh T. Stoddard, Superintendent of the School District during the entire period of Mrs. Williams' work at Manchester, was familiar with her work and considered it very good. She taught Home Economics and Family Living in the 9th, 10th, and 12th grades, had originally applied for a position in 1954 and was hired for the 1954–55 school year. Each Spring thereafter, until 1964, she, along with other teachers so inclined, indicated

---

2. 34 Am.Jur., Mandamus § 32 (1941).

3. There is some dispute as to whether plaintiff obtained permission from a lesser official; there is no dispute that she was absent. Principal Robinson states that she did ask permission.

desire for reemployment in the same form submitted in evidence for 1963–64:

Office of Superintendent

Mrs. Irene B. S. Williams,
School District Two.

Dear Mrs. Williams:

At a recent meeting of the Board of Trustees you were re-elected as a teacher in Sumter School District Number Two for the school year 1963–64.

It is requested that you indicate your acceptance or rejection by affixing your signature below and returning one copy of this letter within ten days after it has been received.

In the event that state aid is cut off as a result of the closing of a school or schools by court order, this contract is null and void.

We hope that you have enjoyed your work in our school district during this school term.

Sincerely yours,
/s/ Hugh T. Stoddard
Hugh T. Stoddard,
Superintendent.

I hereby accept the above offer for employment in Sumter School District Number Two for the year 1963–64.

/s/ Irene B. Williams
—————————————
Signature

Date  May 15,  1963.

On May 18, 1964, after the civil rights events related hereinabove, and after Principal Benjamin F. Robinson of the Manchester School recommended her reemployment for the 1964–65 school year, Dr. Stoddard, who in turn had responsibility and authority for recommendations to the Board of Trustees (with final say in the hiring), wrote to Mrs. Williams:

I should like to have a conference with you at 4:30 P.M. on Wednesday afternoon, May 20, 1964, if this hour does not conflict with a previous engagement.

Yours very truly,
/s/ Hugh T. Stoddard
Hugh T. Stoddard,
Superintendent.

Thereafter, on May 20, Mrs. Williams appeared and was orally advised she was not recommended for reemployment. She was advised of her right to appeal, and immediately, by letter, requested a hearing before the Board. On June 16, 1964, she appeared before the Board along with counsel, and the next day was advised:

Dear Mrs. Williams:

The Board considered your request as presented last night in the hearing at considerable length, but arrived at no final decision during that meeting.

You are herewith advised that a final decision will be made and conveyed to you in about two weeks.

Yours very truly,
/s/ Hugh T. Stoddard
Hugh T. Stoddard,
Superintendent.

On June 24 she was advised:

Dear Mrs. Williams:

Your appeal presented to the Trustees, requesting renewal of contract for 1964–65, was considered in meeting of the Trustees of Sumter County School District Number Two.

You are herewith advised that no action was taken by the Trustees; and the initial notification, under date of May 18, 1964, still stands as the formal action of the Trustees.

Yours very truly,
/s/ Hugh T. Stoddard
Hugh T. Stoddard
Superintendent.

Her appeal was not granted and she was not reemployed. At no time during the entire proceedings was (or has she yet been) advised of the reason for refusal of reemployment. At the Board of Trustees' hearing of June 16 colloquy between plaintiff counsel Finney and defendants' counsel Nash was:

Mr. Finney: May we inquire if the Board would state a reason why it has decided not to renew the contract of Mrs. Williams for the 1964–65 school year?

Mr. Nash: The Board hasn't stated any, the four teachers that were not

re-elected, why they were not re-elected.

Mr. Finney: Then am I to assume that in this instance the Board—

Mr. Nash: The Board has not stated to your client why she was not re-elected.

Mr. Finney: But my question was, at this time would the Board—

Mr. Nash: The Board doesn't care to state, so I am advised.

and between counsel Nash and plaintiff:

Mr. Nash: Of course you understand that there are other things besides the fact of your education and your certificate that enter into teaching of a class of pupils?

Mrs. Williams: Oh yes, surely. And I wrote the Board to request this hearing and I am very happy to be granted that request. And I stated in the letter that I thought my service at Manchester for the past ten years merited at least a consideration of being given a reason for not having my contract renewed, and I was hoping—

Mr. Nash: Well of course you realize that this renewal is at the pleasure of the board, from year to year.

Mrs. Williams: Yes, I have been told that. Nevertheless I still feel that I have served the board, the school district—

Mr. Nash: Do you think that you have a right to this job as a matter of course, like when I was city attorney, they fired me and elected somebody else, and I had been city attorney for twenty years, but they up and fired me.

Mrs. Williams: Well I hope they gave you a reason. But no, I don't feel that I have a right to this job, but having had the job and feeling that I have done a good job, I feel that now that you no longer need my service, I feel that you should give me a reason, because my professional career is somewhat at stake. I will need to get a job and more than

likely I will be asked, why were you fired?

Mr. Nash: You weren't fired.

Mrs. Williams: Well, why was your contract not renewed? I list my qualifications, and then, these, well, why do you want this job, and I would say well I, my contract wasn't renewed on the previous job, and they say why. I have no reason. I feel that you are not treating me in the way that you should; I really believe that I am entitled to a reason, and I would like to know.

Mr. Nash: You would like to know why you were not. Well, the board will discuss it and you will be notified.

Parent Teachers' Association President L. B. Rivers testified as to the efforts of his organization to assist her reemployment, of their endorsement of her and her qualities. Of his personal contact with Dr. Stoddard, he testified:

Q Would you describe any personal conversation between you and Mr. Stoddard concerning the matter?

A We were aggrieved so much to know she was left out, and I asked him what was the cause of it and he said, it was a matter for the board and the board failed to renew her contract and rehire her and it was the action of the board and he had no comment.

From the deposition of Dr. Stoddard, this court excerpts various colloquies:

(Concerning the wool contest in which plaintiff endeavored to enter Negro children)

Q So actually this wool contest wouldn't have anything to do with the criteria of Mrs. Williams, whether or not she was a good teacher or not, is that right?

A It would reflect on her mature and professional judgment I would say.

(regarding the picketing of various stores)

Q (By Mr. Sampson) Yes, sir. Continue please.

A At some time during the fall, on Saturday morning, when I had gone by the post office to pick up the school mail, I observed Mrs. Williams picketing some business establishments on the streets of Sumter, which in my personal opinion reflected poor professional judgment and did not dignify the position which she held in the schools in the eyes of the community.

(as to her absence on August 28, 1963)

Q Now as a result of that particular incident and occasion, state what action at that time did you take in reference to Mrs. Williams?

A I asked Professor Robinson if he knew of a reason, or if she had contacted him.

Q And as a result of that what did you do or find out?

A He said she had approached him and he had approved it, at which time I pointed out specifically to him that he had arrogated unto himself responsibilities which by practice remained within the hands of the supervising principals or my office.

Q The simple truth is she had the permission of the principal, is that right?

A But not permission from the office of the superintendent or other personnel.

(with reference to her arrest)

Q Now in reference to the incident of arrest, state what action you took if any, on or about the time that she was arrested, by your office.

A No action was taken.

Q Did you not call her in?

A I did not.

Q You did not write her a letter?

A I did not.

Q And about what date was this arrest?

A I think it was in September, as I recall.

Q September, 1963, and you waited until May 15th, 1964, before you did anything about it to her, is that right?

A Yes.

It is unnecessary to fill the record here with other uncontradicted facts as exposed by the various examinations and depositions. The pattern is clear.

At the trial the court, upon objection of defendants' counsel, excluded certain answers requested of Dr. Stoddard. In candor, the court admits this may have been error, but the evidence was not vital. Certainly defendants cannot claim harm.

The Constitution of the United States is the written guarantee of freedom and justice to Americans everywhere. The United States Supreme Court, in its interpretation of the Constitution's application to human rights, or civil rights, as exposed by trial under common law or effect of statute, decides, and that decision *is the Law of the Land* unless or until changed by proper authority. The philosophy, phraseology, decree of the United States Fourth Circuit Court of Appeals, where *not in conflict* with the Supreme Court becomes the law of this court. With this in mind this court proceeds herein.

■ We are guided by Beilan v. Board of Public Education [4] where the Court said:

By engaging in teaching in the public schools, petitioner did not give up his right to freedom of belief, speech or association. He did, however, undertake obligations of frankness, candor and cooperation in answering inquiries

4. 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed. 2d 1414 (1958). The teacher was discharged after repeated warnings because of failure to answer a question of his superintendent as to his membership in a Communist political association. This was determined by a Pennsylvania court to be subject to the coverage of statute allowing discharge for "incompetency." The United States Supreme Court affirmed the discharge as not being violative of the Federal Constitution.

made of him by his employing Board examining into his fitness to serve it as a public school teacher.

'A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted.' * * *

We find no requirement in the Federal Constitution that a teacher's classroom conduct be the sole basis for determining his fitness. Fitness for teaching depends on a broad range of factors. The Pennsylvania tenure provision specifies several disqualifying grounds, including immorality, intemperance, cruelty, mental derangement and persistent and willful violation of the school laws, as well as 'incompetency.' However, the Pennsylvania statute, unlike those of many other States, contains no catch-all phrase, such as 'conduct unbecoming a teacher,' to cover disqualifying conduct not included within the more specific provisions.

Defendants maintain here that no Federal question has been raised. They insist, and plaintiff admits, she has no right of tenure, as such, under state or federal law. They insist, and plaintiff admits, her contract expired and was not renewed. The highest court of South Carolina has said, in In Re School District No. 4 of Charleston County [5] that: "The right and power of the local board of trustees to select and employ teachers in the schools of its district and under its jurisdiction being absolute * * * [is] subject only to confirmation and rejection by the County Board of Education * * *"

Defendants are emphatic that the court should not, has no authority to, write a contract between plaintiff and the school district. This court is equally emphatic in its denial of either responsibility or authority to write the contract. Defendants propose "Is the court going to be the Board of Trustees of School District No. 2?" Equally emphatically, the court is not.

This court is prepared to protect, interpret, insist upon the securing to plaintiff of all of her constitutional rights. For guidance this court respectfully refers to, and follows the lucid opinion in Willa Johnson v. Joseph Branch.[6]

In the Johnson case plaintiff was a well qualified, conscientious and competent English Teacher in Enfield, Halifax County, North Carolina, for 12 years. In April 1963 civil rights efforts in the area reached a high level of activity and continued thereafter. Plaintiff and her family were openly active therein up to and into the winter of 1964, and continued through the time teaching contracts came up for renewal in April 1964. In March 1964 plaintiff's principal sent her a letter listing seven infractions of school rules which he asked her to correct; none involved the quality of her classroom work. Early in April she received a letter from the principal commending her improvement [as to infractions] and advising he had recommended her re-election as teacher for 1964–65; in fact he signed her contract to comply with legal requirements that he recommend before the hiring committee could act. There is no dispute that during all this time their relations were strained because of opposite views on civil rights. When the school committee met the two letters of March and April were before them and they declared in testimony that their decision was based solely on the letters. After postponing action until May 27, 1964, they voted against renew-

5. 153 S.C. 222, 150 S.E. 776 also styled Heath v. Richards. No subsequent decision of the South Carolina Supreme Court has changed this interpretation of authority.

6. 364 F.2d 177 (4th Cir. No. 10,281, June 6, 1966) (en banc, opinion by Bell, J.).

ing the contract. On June 2 the Principal told her the contract had not been renewed because of insubordination. Previously a member of the school board, present at the voting on her, had told her husband that a teacher would be fired for voting (civil rights) activity. The district court found the Board had good cause and this was held to be error.

The parallel between the *Johnson* case and the problem here is striking. In each both were outstanding teachers. In each no classroom activity is involved. In each a renewal contract is denied. In each the freedom to participate in civil rights activities OUTSIDE the classroom and off the school grounds exists. The chronology is analogous. The treatment is the same, except that in the case now before the court the School Board gave *no* reason.

In North Carolina, as in South Carolina "There is no vested right to public employment." [7] This court finds no parallel between the case at bar and Bradford v. School Dist. No. 20, Charleston Co.; [8] in the Bradford case the suspension of the teacher for public drunkenness and assaulting an officer, designated to be "by reason of his alleged misconduct," was upheld by the district court, affirmed on appeal. *Here there is no violation of the law,* unless the Board relies on her "arrest" when demonstrating. Mrs. Williams' activity at most was in pursuit of those salient freedoms guaranteed and spelled out in the First Amendment: [9] Free speech, the right of the people peaceably to assemble. She is entitled, in this and every court, and outside in the freedom of her county, the equal protection of the laws.

Parker v. Board of Education of Prince George's County, Maryland,[10] is equally distinguishable on the facts; there a *contract* and *its provisions* were controlling. Here there is no issue as to the terms of a contract.

■■ This court adopts the language of Judge Bell as applicable to this case. It respects the wide discretion of the School Board of Sumter School District No. 2 but "however wide the discretion of School Boards, it cannot be exercised so as to arbitrarily deprive persons of their constitutional rights." [11] The action of the Sumter Board was, is, arbitrary, capricious, without constitutional foundation, and beyond constitutional authority. It is obvious that plaintiff was refused, denied, reemployment because of her civil rights activity. The record reveals no other possible motive. The refusal of the Board to specify is silent witness to the discrimination. Again we apply the logic of *Johnson.*

■ Discretion means the exercise of judgment, not bias or capriciousness. Thus it must be based upon fact and supported by reasoned analysis. In testing the decision of the school board the district court must consider only the facts and logic relied upon by the board itself. It is "a simple but fundamental rule of administrative law * * * that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency." SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). Similarly the district court may not usurp the discretionary power of

---

7. Johnson v. Branch, note 6 supra.

8. 364 F.2d 185 (4th Cir. No. 10,280, June 6, 1966) (Bell, J.).

9. Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

10. 348 F.2d 464 (4th Cir. June 28, 1965).

11. Johnson v. Branch, note 6 supra.

the school board but must judge the constitutionality of its action on the basis of the facts which were before the board and on its logic.

In his usually able dissent in *Johnson* Judge Bryan distinguished that case as "it clearly appears that this is not a color case." Would that this court could so find here. In the revolutionary processes now in and about our great country seeking definition, preservation of men's rights, their civil rights, color is the key, the causa sine qua non of a trouble society. Our forefathers, wise beyond their time, prepared to assure their previous statement of hope to the words that: "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness." [12] As has recently been declared by the United States Fourth Circuit Court of Appeals in a case [13] having at issue teacher discrimination based on race:

> The plaintiffs as a class are entitled to an order requiring the Board to set up definite objective standards for the employment and retention of teachers and to apply them to all teachers alike in a manner compatible with the requirements of the Due Process and Equal Protection Clauses of the Constitution.

This definition of the duties of School Boards in faculty employment and retention applies here.

Plaintiff is entitled to the relief demanded in the Complaint.

Her application for the school year 1965–66, not here in issue, was received, acknowledged, ignored. This court does not invite further issue as to 1966–67. If attainable among the parties, or by agreement of counsel, an order agreeing

on damages, monetary relief, et cetera, would be welcomed by the court.

The Clerk will enter appropriate order. Mandamus will be unless agreement is forthcoming.

And it is so ordered.

12. Declaration of Independence.

13. Chambers v. The Hendersonville City Board of Education, 364 F.2d 189 (4th Cir. No. 10,379, June 6, 1966) (en banc; opinion by Bell, J.).